**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**Alvin WINOGRAD and Joseph Siegel,**
**Defendants-Appellants.**

Nos. 80–1548, 80–1673.

United States Court of Appeals,
Seventh Circuit.

Argued Feb. 12, 1981.

Decided Aug. 12, 1981.

Rehearing and Rehearing In Banc
Denied Oct. 31, 1981.

---

Jeffrey N. Cole, Chicago, Ill., A. Raymond Randolph, Jr., Washington, D. C., for defendants-appellants.

James R. Ferguson, Asst. U. S. Atty., Chicago, Ill., for plaintiff-appellee.

Before SWYGERT, Senior Circuit Judge, and PELL and WOOD, Circuit Judges.

PELL, Circuit Judge.

At the conclusion of a jury trial, the defendants were found guilty of conspiracy to defraud the United States by impairing the United States Treasury Department's collection of income taxes in violation of 18 U.S.C. § 371, aiding the preparation of

fraudulent United States income tax returns in violation of 26 U.S.C. § 7206(2), and entering into fixed and uncompetitive commodity futures transactions and wash sales in violation of 7 U.S.C. § 6c(a)(A). This appeal followed the entry of judgment on the jury verdict.

## I

In the fall of 1974, Harold Brady, repeatedly characterized by the parties as "one of the world's largest copper traders," and apparently being desirous of providing himself with a tegurium protecting himself to some extent from the inevitable result of an overabundance of otherwise taxable income, employed the Siegel Trading Company to execute various commodity futures transactions in order to defer certain tax payments otherwise due that year. Appellant Siegel was the president of the company, appellant Winograd was vice-president, and both appellants were active floor-traders in commodities futures. After negotiations between the appellants and agents for Brady, it was decided that one of the procedures that would be utilized to achieve this objective was the placement of "tax straddles" in Mexican peso futures contracts on the International Monetary Market in Chicago. "Tax straddles" or "tax spreads" were, at the time at least, legitimate means to accomplish the deferring of tax payments from one year to the next and sometimes the conversion of short-term gains into long-term gains. The basis of the procedure is that normally price changes in two different future month contracts of the same commodity move in the same direction and in the same amount. The deferral or conversion is accomplished by going "long" or being a net buyer in one future month of the commodity, and going "short" or being a net seller in another month of the same commodity. When the prices of the future contracts change (generally increasing in peso futures), one account will show a loss while the other shows the corresponding, and hopefully equal, gain. The key to the transaction is to liquidate the loss-bearing account or "leg" during the first tax year or in the short-term, and to liquidate the gain-

bearing account or "leg," if possible, in the following tax year or in the long-term. The legs are usually immediately reestablished for future months, thus "rolling over" the transaction. If all goes as expected, the losses should nearly or exactly equal the gains and thus there would be no real economic impact on the investor. Beneficial tax treatment results, however, when, as here, the short term "losses" shelter other unrelated short-term gains in the first year, in effect converting the amount which would have been short-term gain in the first year into gain in the second year.

As stated previously, "tax straddles" were legitimate and legal means of deferring or converting tax consequences when properly executed on an established commodities futures exchange or market and through bona fide competitive trades. The Government's position in this case, however, is that the appellants executed Brady's peso trades not through bona fide trades and open-outcry on an established market, but through prearranged and uncompetitive trades done between various employees of the Siegel Trading Company. The Government concludes, therefore, that Brady improperly deducted his short-term losses and that the appellants are guilty of the charged violations.

## II

■ Appellants' first point of contention is jurisdictional. Winograd claims that because Mexican pesos are delivered only in Mexico at the maturity of the futures contract, peso futures, in fact, all international monetary futures, do not involve commodities "in" interstate commerce as required by 7 U.S.C. § 6c(a)(A). This contention may be easily dismissed with reference to the cited section which states in part:

(a) It shall be unlawful for any person to offer to enter into, enter into, or confirm the execution of, any transaction involving any commodity, which is *or may be used* for (1) hedging any transaction in interstate commerce in such commodity ... (2) determining the price basis of any

such transaction in interstate commerce in such commodity or (3) delivering any such commodity sold, shipped or received in interstate commerce for the fulfillment thereof—(A) if such transaction is ... [a wash sale, etc.]. [Emphasis supplied.]

The broad language of the statute is applicable to the facts of this case. Although delivery of the pesos underlying a futures contract may take place in Mexico, the Government presented sufficient evidence that the peso futures contract could be used to hedge an interstate transaction involving pesos, could be used to determine the price basis of an interstate transaction involving pesos, and could involve the delivery of pesos in interstate commerce. The facts that, for the purpose of convenience, bank credits are often transferred instead of the actual pesos, and that in the normal course of events actual delivery of the pesos to fulfill the futures contract does not occur because the obligations are met by offsetting trades, do not alter this result. Actual delivery of the pesos to fulfill the contract is not required. *Board of Trade of Chicago v. Olsen*, 262 U.S. 1, 43 S.Ct. 470, 67 L.Ed. 839 (1923). *Accord, In re Siegel Trading Co.*, Com.Fut.T.Rep. (CCH) ¶ 20,452 (1977); *and see CFTC v. Muller*, 570 F.2d 1296, 1299 (5th Cir. 1978).

### III

■ Winograd also complains that the Government's witness who testified regarding the jurisdictional basis of this prosecution, Richard Fung, was not properly qualified as an expert in commodity futures transactions, and was improperly allowed to testify regarding the jurisdictional issue without prior *voir dire* examination by appellants. We agree with appellants that the Government's qualification of Fung might have been arguably inadequate had he testified regarding the more technical and esoteric areas of commodity futures transactions and tax straddles. His knowledge apparently was acquired solely from reading various unnamed books. However, we do not believe the trial court abused its discretion in allowing Fung to testify without *voir dire* examination regarding some of the more mechanical aspects of futures transactions and, for example, whether they could be used to hedge other transactions. His testimony was not shown to be incorrect and undoubtedly aided the jury in understanding the issues. *Kline v. Ford Motor Co., Inc.*, 523 F.2d 1067 (9th Cir. 1975). He had been employed by the CFTC in market examination for over four years and appellants themselves have relied upon some of Fung's testimony in making their arguments to this court. The district judge's decision, therefore, will not be overturned.

### IV

### (A)

One of the more fundamental issues appellants present is that the Government's evidence was insufficient to convict them. In this argument, appellants contend that it was the Government's burden under the income tax counts to establish that the peso transactions were "risk-free" so that the short-term "losses" were improperly deducted, and that the Government failed to establish this fact by the requisite proof.

■ Appellants' characterization of the Government's case is in a sense warranted. We disagree, however, with their conclusion. The Government contends, basically, that the transactions were "risk-free" because they were prearranged and thus Brady had a guaranteed seller or buyer for his position when he had accomplished his tax objectives and liquidated one leg of his position. It is true that Brady had little or no risk of market entry or exit. However, the transactions appellants executed for Brady nevertheless incorporated substantial "risks" relevant to the income tax counts because appellants did not have control over the market price of pesos and therefore Brady stood to lose substantial amounts of money if the price moved contrary to their expectations, or if the spreads between the two months' prices changed relative to each other or, in the words of Winograd on one occasion, "the spread [price] differential" had gotten "out of whack."

Notwithstanding this "risk," however, we find that the district court correctly held that the Brady "losses" were not properly deducted. Our conclusion is not based upon weighing the risks involved in the peso transactions, but is based upon the fact that the appellants did not accomplish their tax objectives through bona fide transactions in the competitive open market. The Government presented substantial evidence that Brady's trades were not done in the usual manner of open-outcry in the peso area or "pit" of the IMM, but were prearranged "crosses" done in-house between traders in the Siegel Trading Company. The trades often were not done within the relevant day's price range, and in some cases Winograd would engage in the irregular practice of "bidding" for a contract at a price lower than he was "offering." In essence, therefore, appellants *appeared* to be utilizing the organized market, but were in fact *creating* a market for their transactions at the prices they established for ulterior purposes. Such prearranged trades are not bona fide transactions supporting loss deductions.

### (B)

■ Siegel makes the additional argument that the Government's evidence failed to establish that he knew of the prearranged trades Winograd executed for Brady. Indeed, the district judge commented: ". . . the amount of direct evidence regarding Mr. Siegel is minor at best, it is bits and pieces." We cannot fault the judge for this characterization. The entirety of the Government's case against Siegel relied upon inferences to be drawn from his vague and oblique prior comments and from the circumstances of his senior position at the trading company. Our standard of review, however, is not whether some other jury might have decided differently, but rather whether the evidence and inferences when viewed in the light most favorable to the Government's position can reasonably be said to support the jury's determination. *Glasser v. United States*, 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942). We hold that it can here, notwithstanding the closeness of the case, and thus affirm the district court's denial of appellant's motion for acquittal and the jury's conclusion on guilt.

### V

■ Winograd's next complaint is based upon *Bruton v. United States*, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968), and is that certain statements made by Siegel were admitted against Siegel at the consolidated trial. Winograd claims that the introduction of these statements greatly prejudiced his case and denied his right to a fair trial because of his inability to examine Siegel concerning them.

We find that the admission of these statements was proper. The statements were that, "I was crazy" and that the writing of a certain note by Winograd was "dumb and stupid." Neither of these deprecatory characterizations were in any way similar to the inculpatory confession improperly admitted in *Bruton*. Indeed, the first remark did not even relate to Winograd. They were not, in short, "powerfully incriminating" of Winograd, *id.* at 135, 88 S.Ct. at 1627, although they did play an important role in the Government's case against Siegel. We cannot regard these remarks in themselves as prejudicial, *United States v. Belle*, 593 F.2d 487, 493–94 (3d Cir. 1979), *cert. denied*, 442 U.S. 911, 99 S.Ct. 2825, 61 L.Ed.2d 277; *United States v. Knuckles*, 581 F.2d 305, 312–13 (2d Cir. 1978), *cert. denied*, 493 U.S. 986, 99 S.Ct. 581, 58 L.Ed.2d 659, and they were not vitally important to the Government's case against Winograd which was not prosecuting Winograd for dumbness or stupidity. *United States v. Wingate*, 520 F.2d 309, 313 (2d Cir. 1975), *cert. denied*, 423 U.S. 1074, 96 S.Ct. 858, 47 L.Ed.2d 84 (1976). Cautionary instructions were repeatedly given to the jury by the trial judge. In these circumstances, we find, therefore, no error in the district court's admission of the statements.

### VI

■ Siegel next challenges certain comments made by the prosecution during its closing arguments. During the argument

the Assistant United States Attorney stated:

Ladies and Gentlemen, the idea that Mr. Siegel has a defense that he didn't know what was going on is disturbing for two reasons. First of all, as we just talked about, it is contrary to the evidence in this case.

But secondly, if Mr. Siegel were acquitted on that defense, then Alvin Winograd would take the blame by himself.

Now, it was Mr. Siegel's company, it was Mr. Siegel's client that these trades were executed for. It was Mr. Siegel who orchestrated the phony trades. It was Mr. Siegel whose company made $90,000. He didn't share any of that with Mr. Winograd.

You can see to it that Mr. Siegel starts sharing. You can see to it that he shares the blame with Mr. Winograd, which is the very least he can do.

Siegel claims that these comments were calculated to arouse prejudice against Siegel and "had some likelihood of changing the result of the trial." We disagree. While we scarcely would wish to approve this type of approach on behalf of the Government, we are unable to say that the statements were either "calculated" unfairly to prejudice Siegel, or were they sufficient to alter the result of the trial. The comments consisted of a few sentences in almost 2800 pages of transcript. *See, e. g., United States v. Alpern,* 564 F.2d 755, 759–60 (7th Cir. 1977). The jury was properly instructed to consider only the evidence presented at trial and not to consider the comments of the attorneys as evidence. *See Donnelly v. DeChristoforo,* 416 U.S. 637, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974). We do not find, therefore, reversible error.

## VII

■ Finally, Siegel claims that the trial judge erred in not admitting certain evidence offered by Siegel showing that he properly entered into many futures contracts for Brady in commodities other than monetary futures. Siegel claims on appeal that the evidence should have been admitted because it shed light on the prior statements made by Siegel that served as the primary basis of the Government's case against him. A detailed review of the record and transcript in this case, however, has failed to reveal to us any instance where this rationale or theory was presented to the district court. Rather, the only rationale for the admission of the evidence presented to the trial judge was that the evidence was relevant to show Siegel's lack of knowledge of the illegal trades. The district judge correctly refused to admit the evidence on this basis because evidence that Siegel engaged in certain legal trades is generally irrelevant to the issue of whether he knew of other illegal trades. *United States v. Dobbs,* 506 F.2d 445, 447 (5th Cir. 1975); *Herzog v. United States,* 226 F.2d 561, 565 (9th Cir. 1955), *cert. denied,* 352 U.S. 844, 77 S.Ct. 54, 1 L.Ed.2d 59 (1956). It is well established, furthermore, that the appellant cannot raise theories or issues for the first time on appeal which were not presented to the trial court for consideration. *Laketon Asphalt Ref. v. U.S. Dept. of Int.,* 624 F.2d 784, 788 (7th Cir. 1980); *Bliss v. Equi. Life Assur. Soc. of U.S.,* 620 F.2d 65, 70 (5th Cir. 1980). Notwithstanding some persuasiveness of appellant's present theory of introduction, this is not an "exceptional situation" where the evidence would be admissible "beyond doubt," *Wagner v. United States,* 573 F.2d 447, 451 (7th Cir. 1978), nor where the evidence is so compelling that it would virtually insure Siegel's success in the trial court, *Furtado v. Bishop,* 604 F.2d 80, 87 (1st Cir. 1979), *cert. denied,* 444 U.S. 1035, 100 S.Ct. 710, 62 L.Ed.2d 672 (1980).

Finally, we note that the offered evidence would have introduced into the trial what could be regarded as collateral issues of some consequence, *i. e.,* the fact that the other contracts were handled could only have any materiality if they were legitimate. A real possibility of a substantial trial within a trial could have resulted. We are reluctant to disturb the trial judge's exercise of discretion in confining the trial to the issues directly presented.

The district court's refusal to admit the evidence, therefore, will not be the basis for reversal.

For the reasons given herein the judgments of conviction are

Affirmed.