UNITED STATES of America, Plaintiff,

v.

William KENNEDY, et al., Defendants.

Crim. A. No. 92–CR–227.

United States District Court,
D. Colorado.

May 3, 1993.

Stephen Peters, Linda S. Kaufman, Asst. U.S. Attys., Denver, CO, for plaintiff.

David Lane, Joseph Swenson, Denver, CO, for William R. Kennedy, Jr.

Robert M. Maes, Denver, CO, Robert Sutton, Milwaukee, WI, for Jon Apelgren.

Charles Szekely, Asst. Federal Public Defender, Denver, CO, for Todd Brock.

Michael R. Enwall, Boulder, CO, for Larry Brokaw.

Leonard M. Chesler, John S. Tatum, Chesler Law Firm, Denver, CO, for Timothy Brown.

William Rapson, Steve Waters, J. Louise Betcher, Robinson, Waters, O'Dorisio & Rapson, P.C., Denver, CO, for Michael Byron.

Peter R. Bornstein, David H. Goldberg, Denver, CO, for Mark B. Cates.

Terri Harrington, Denver, CO, for Craig Collier.

Craig B. Shaffer, Gregory A. Ruegsegger, Welborn Dufford Brown & Tooley, P.C., Denver, CO, for James Dye.

John H. Schlie, Christopher C. Cross, J. Linden Hagans, Cross, Schlie & Heckenbach, P.C., Englewood, CO, for Murdeen Helm.

David Japha, Martha K. Horwitz, Denver, CO, for Michael Holtz.

Robert Berger, Denver, CO, for Terrance Jones.

Glen R. Anstine, Glen R. Anstine, P.C., Denver, CO, for Michael Martin.

John N. McNamara, Jr., John N. McNamara, Jr., P.C., Denver, CO, for Michael Oldewage.

Scott D. Wolfe, Denver, CO, Randy McDonald, Randy McDonald, P.C., Houston, TX, for Daniel Orick.

Forrest W. Lewis, Schoenwald & Lewis, P.C., Denver, CO, Wendell A. Odom, Jr., Houston, TX, for Terry Orick.

Frank Moya, Moya & Recht, Denver, CO, for David Tomsick.

Richard Stuckey, Denver, CO, for Gary Upperman.

Terry Wiggins, Karsh & Fulton, P.C., Denver, CO, for James Warren.

## MEMORANDUM OPINION AND ORDER

BABCOCK, District Judge.

A hearing was held April 23, 1993 on the following pending motions in this case:

A) severance motions by the government and defendants Brown, Byron, Dye, Oldewage, D. Orick, and T. Orick;

B) defendants' various discovery motions;

C) government's pre-trial motions.

### I.

This case involves nineteen defendants charged with one or more counts of racketeering, mail fraud, wire fraud or money laundering as a result of their employment or association with Western Monetary Consultants, Inc. (WMC), between January 1, 1984 and March 28, 1988. Defendant Kennedy had been the President and owner of WMC from 1979 through and including the date of the indictment.

Six of nineteen defendants—Kennedy, Apelgren, Brown, Byron, Dye, and Helm, are charged with participating in a racketeering enterprise during the four-year time period

between January 1, 1984, and March 28, 1988 (the racketeering defendants). Three additional defendants charged with racketeering, Brokaw, Warren, and Tomsick, have entered guilty pleas to the racketeering charge, and the court has deferred sentencing on these three until after the trial of the remaining defendants. Essentially, the indictment charges that the racketeering defendants operated a Ponzi scheme in the unregulated sale of precious metals. The racketeering defendants are also charged with related violations of the mail fraud, wire fraud, and money laundering statutes.

The other ten defendants—Brock, Cates, Collier, Holtz, Jones, Martin, Oldewage, D. Orick, T. Orick and Upperman, are each charged with between three and eight counts of mail and wire fraud (the telemarketing defendants). These defendants functioned primarily as telemarketers for WMC, the alleged racketeering enterprise.

The stated purpose of WMC was to sell precious metals and rare coins to the public. The metals were sold with the promise that the price of the metal would be "locked in" at or about the time of the sale, and that WMC would purchase the metal immediately. The government charges that, in fact, WMC diverted its clients' money to other undisclosed uses, in many instances delayed the purchase of the metal, and in other instances failed to purchase the metal at all.

WMC sold precious metals to the general public over the phone and, beginning in about 1984, at "investment" seminars conducted throughout the United States. The seminars consisted of sophisticated sales presentations including geopolitical speeches designed to convince clients that world events warranted precious metals purchases as a hedge against inflation and the threat of communism. The defendants allegedly targeted wealthy, elderly clients who maintained conservative political and religious beliefs.

The affairs of WMC were managed at defendant Kennedy's direction by a committee first known as the Review Committee, and later called the Finance Committee or the Operations Committee. This committee was comprised of defendants Tomsick, Brown, Helm, Apelgren, Warren, and Byron.

According to the government, this committee met on a regular basis to determine which purchase orders to fill, which orders to delay, and which orders not to fill. The committee also determined what amount of client money to divert to other purposes.

The alleged uses of diverted client money include but are not limited to, the payment of expenses necessary to run WMC, the purchase of and payment of expenses necessary to run the *Conservative Digest* magazine, the personal use by defendant Kennedy and his family, and the purchase, refurbishment and transport of a helicopter for the Nicaraguan freedom fighters in Central America.

In March, 1988, defendant Kennedy sent letters to WMC's clients representing that the failure to fill client orders resulted from the tremendous growth of the business and the pressures this put on his overworked staff, when, according to the government, WMC's failure was caused by speculative activities, the failure to secure metals to meet client obligations, and the diversion of client funds. On or about March 28, 1988, WMC filed for protection under Chapter 11 of the U.S. Bankruptcy Code in the U.S. Bankruptcy Court for the District of Colorado. Over 600 clients were listed as creditors from whom WMC had received over $18,000,000 toward orders which were not filled. The market value of these unfilled orders at the time of the bankruptcy was approximately $37,162,000.

Four months have been reserved for trial beginning August 2, 1993.

## II.

### A. SEVERANCE

A total of seven severance motions are pending with defendant Collier joining in three of these motions. Defendants Brown, Byron and Dye have moved for separate trials on the grounds that they would be unfairly prejudiced by the evidence during either a joint trial or bifurcated trial. Defendant Oldewage contends that he would be unfairly prejudiced by the duration of a joint trial due to his business and family obligations. Defendants Daniel Orick and Terry

Orick have moved for separate trials, but in the alternative they have requested the same relief which the government is seeking—a severance of the 6 remaining racketeering defendants from the other 10 defendants for a total of two separate trials.

The government proposes in its motion for severance that the racketeering defendants be tried together and severed from the remaining defendants. The telemarketers, then, should be tried together in a second trial. The government contends that the severance of the racketeering defendants from the other defendants would be both logical and supported by the case law. *See U.S. v. Vastola,* 670 F.Supp. 1244, 1262–63 (D.N.J.1987); *U.S. v. Gallo,* 668 F.Supp. 736, 748–51 (E.D.N.Y.1987).

Five defendants—Apelgren, Brock, Byron, Cates, and Dye (the responding defendants), have filed responses in opposition to the government's proposal for severance with defendants Holtz, Martin and Kennedy joining in one or more of such motions. Apelgren's response consists of a one-sentence declaration that any severance would deny him equal protection and due process of law. A common argument in the remaining 4 responses is that the government should be forced to try all 16 remaining defendants together because the government decided to join them in one indictment. Defendants Byron and Dye, however, also contend that they are entitled to separate trials.

■ In summary, three approaches to the trial of this case have been proposed: (1) that I try all defendants in one trial and deny all motions for severance; (2) that I grant individual trials to those defendants who allege prejudice pursuant to Rule 14; and, (3) that I bifurcate this case into two trials—one for the six racketeering defendants and one for the ten telemarketing defendants. I will hold two separate trials for the reasons set forth below.

### 1) Prejudice under Rule 14

There is a preference in the federal court system for joint trials of criminal defendants who are indicted together, given that joint trials promote efficiency and serve the inter-ests of justice by avoiding inconsistent verdicts. *Zafiro v. U.S.,* 506 U.S. ——, ——, 113 S.Ct. 933, 937, 122 L.Ed.2d 317, 324 (1993).

■ Rule 14 of the Federal Rules of Criminal Procedure permits a district court to grant a severance of defendants if it appears that a defendant or the prosecution is prejudiced by joinder. Rule 14 leaves the determination of risk of prejudice and the tailoring of the relief to be granted, if any, to the sound discretion of the district court. *Zafiro,* —— U.S. at ——, 113 S.Ct. at 937, 122 L.Ed.2d at 325. The Supreme Court indicates that a district court should grant severance under Rule 14 only if there is serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence. *Id.* at ——, 113 S.Ct. at 937, 122 L.Ed.2d at 325; *accord, U.S. v. Youngpeter,* 986 F.2d 349, 353 (10th Cir.1993). The Tenth Circuit requires a showing of real prejudice. *U.S. v. Jones,* 707 F.2d 1169, 1171 (10th Cir.), *cert. denied,* 464 U.S. 859, 104 S.Ct. 184, 78 L.Ed.2d 163 (1983).

The *Zafiro* Court offers several examples of situations that constitute a high risk of prejudice: (1) when evidence that the jury should not consider against a defendant and that would not be admissible if a defendant were tried alone is admitted against a codefendant; (2) when there is evidence that is probative of a defendant's guilt but technically admissible only against a codefendant; (3) when there is exculpatory evidence that would be available to a defendant tried alone but is unavailable in a joint trial. *Zafiro,* —— U.S. at ——, 113 S.Ct. at 937, 122 L.Ed.2d at 325.

■ The government argues that it would be prejudiced by a joint trial because the inconsistent defenses in this case would present a significant problem under *Bruton v. U.S.,* 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968). Under *Bruton,* a defendant is deprived of his rights under the confrontation Clause of the Sixth Amendment to the United States Constitution, when his nontestifying co-defendants' confessions or statements incriminating him by reference as a

participant in the crime are introduced against the non-testifying co-defendant at their joint trial. As an example the government explains that most of the telemarketers have made admissions acknowledging that they received regular customer complaints from customers which they forwarded to those racketeering defendants on the Operations Committee. However, these defendants deny knowing that the racketeering defendants were improperly diverting client proceeds to the *Conservative Digest* or to any of the other purposes alleged in the indictment. Under *Bruton,* the racketeering defendants could interpose objections to the admission of these statements during a joint trial. All the defendants in favor of some form of severance, with the exception of Apelgren, list antagonism of defense strategies and/or problems under *Bruton* as factors creating prejudice pursuant to Rule 14.

A second form of prejudice alleged by the government is the burden of a joint trial on a jury. The government contends that in a joint trial of all 16 defendants, the jury could become so overwhelmed that they would vote to acquit rather than to sift through and thoughtfully consider the evidence pertaining to each defendant.

The unreasonable demands that a joint trial would place on the jury is also considered prejudicial by defendants D. Orick, T. Orick, Byron and Brown. These defendants are concerned about jurors' ability to compartmentalize the large amount of evidence in this case or to adequately consider limiting instructions.

Additional forms of prejudice alleged by the defendants include complexity and size of the case, and disproportionality of the evidence. I also note with regret that defendant Upperman's original attorney recently died. Defendant Upperman is a telemarketer. A delay in the commencement of his trial, together with the other telemarketing defendants, will add valuable time for his new counsel to assume and prepare his defense.

### 2) Case Management Considerations

In addition to prejudice under Rule 14, the government makes a strong argument that case management considerations favor severance in this case.

Many courts have identified severance of defendants as a means to assist with the management of complex multi-defendant cases. *U.S. v. Casemento,* 887 F.2d 1141, 1149–53 (2d Cir.1989), *cert. denied,* 493 U.S. 1081, 110 S.Ct. 1138, 107 L.Ed.2d 1043 (1990); *U.S. v. Mancuso,* 130 F.R.D. 128, 130–34 (D.Nev.1990); *U.S. v. Andrews,* 754 F.Supp. 1161, 1170–89 (N.D.Ill.1990); *U.S. v. Shea,* 750 F.Supp. 46, 49–50 (D.Mass), *same case,* 773 F.Supp. 500 (D.Mass.1990); *U.S. v. Gambino,* 729 F.Supp. 954, 969–71 (S.D.N.Y.), *rev'd in part,* 920 F.2d 1108 (2d Cir.1990), *cert. denied,* —— U.S. ——, 112 S.Ct. 54, 116 L.Ed.2d 31 (1991). Although not dispositive in a case such as this, logistical concerns certainly constitute a factor pointing to some rational severance.

In *Casemento,* the Second Circuit affirmed the convictions of 18 of 35 defendants who were tried together in a racketeering prosecution involving narcotics activity, but noted that "an especially compelling justification for a joint trial" should be required in future cases involving more than 10 defendants and in which the government's case is expected to last 4 months or longer. *Id.* at 1152. *Casemento* calls upon trial courts to "weigh the interests of the prosecution, the defendants, the jurors, the court, and the public." 887 F.2d at 1152. The *Mancuso* case, in construing *Casemento,* suggests that the "projected length of trial is one factor to be considered along with others, including the complexity of the case, number of defendants and witnesses, and degree to which the evidence overlaps." *U.S. v. Mancuso,* 130 F.R.D. 128, 134 (D.Nev.1990).

The government contends that its severance plan will involve 6 defendants in the first trial of the RICO defendants on a total of 67 separate charges. The second trial of the telemarketers would involve 10 defendants on 64 charges. The government estimates that the racketeering trial will involve the testimony of approximately 39 witnesses who would not have to testify again during the second trial. Conversely, the second jury would hear from approximately 76 gov-

ernment witnesses who would not testify in the first trial. The government argues that the number of corresponding exhibits in separate trials would also be significantly decreased. The government concedes, however, that there would be some overlapping evidence in each trial.

The government lists several advantages to the jury under its severance plan. First, the jury for the racketeering defendants would have to focus on only six defendants in considering the more complex charges of racketeering and money laundering. Second, in the telemarketing case, the jury would not have to contend with instructions on racketeering and money laundering and can focus its attention on the defendants' mental states. The jury in each trial would have to digest the testimony of fewer witnesses and be exposed to fewer cross-examinations of each witness.

The government also suggests that its severance plan may reduce the cost to the public in one respect. Of the ten telemarketing defendants, eight are represented by a total of nine court-appointed counsel. The government contends that severed trials would reduce the compensable time that court-appointed counsel would be compelled to spend while sitting through evidence unrelated to their clients. See, e.g., *U.S. v. Andrews*, 754 F.Supp. 1161, 1172 (N.D.Ill.1990). Several defendants contested this argument at the April 23 hearing, arguing that counsel for the telemarketing defendants would have to sit through the first trial in order to adequately prepare for the trial of their clients. Nevertheless, it is probable that there will be savings in payments to court-appointed counsel through severance.

### 3) Motions Opposing Severance

■ Almost all defendants opposing severance in this case point to the general presumption in favor of joint trials and against severance. The strong presumption in favor of joint trials is designed to "conserve judicial resources, alleviate the burdens on citizens serving as jurors, and avoid the necessity of having witnesses reiterate testimony in a series of trials." *U.S. v. Gallo*, 668 F.Supp. 736, 748 (E.D.N.Y.1987), citing *U.S. v. Borelli*, 435

F.2d 500, 502 (2d Cir.1970), *cert. denied*, 401 U.S. 946, 91 S.Ct. 963, 28 L.Ed.2d 229 (1971).

Defendant Cates argues that severance would be more prejudicial to the defendants than joinder. He argues that proof of his minimal participation and lack of knowledge will develop as the government introduces evidence against the racketeering defendants. Cates argues that if severance is granted he will be prejudiced by going to trial in a case in which the government will not present the full context of its alleged pattern of racketeering and alleged criminal enterprise because it will fall upon defense counsel to bring this evidence forward. Cates also points out that this will result in duplication of witnesses called at the second trial and that it is likely that two trials will protract the proceedings. Dye adds that because the telemarketers played such an integral role in the RICO scheme, all defendants should be tried together.

The *Shea* court rejected arguments similar to Cates and echoed in other defense responses, that the proposed severance will not save overall trial time or otherwise conserve judicial resources. *U.S. v. Shea*, 773 F.Supp. 500, 501 (D.Mass.1990). I agree with defendants Cates, Brock and Dye that two trials will not necessarily take less time than one. However, this consideration alone is not determinative. Other courts have weighed but found this consideration nondispositive in their severance decisions. *See, e.g., U.S. v. Mancuso*, 130 F.R.D. 128, 133 (D.Nev.1990) ("mere length of trial alone" did not mandate joint trial); *U.S. v. Vastola*, 670 F.Supp. 1244, 1263 (D.N.J.1987) (acknowledging that separate trials could equal the time necessary to conduct a joint trial). On balance, I conclude that there are numerous other compelling considerations favoring severance that will result in overall trial economy.

■ Both defendants Brock and Apelgren contend that it would violate due process to sever this case. A similar argument was rejected in *U.S. v. Shea*, 773 F.Supp. 500 (D.Mass.1990), in which one of the defendants selected for severance contended that he had "the preeminent right to be tried as

he was accused." *Id.* at 501. I reject the argument in this case as well.

### 4) Motions for Individual Trials

■ Defendants Byron, Dye, and Brown argue that if severance is warranted in this case, then they are entitled to individual trials. One or more of the defendants raise the issues of disparity in evidence, disparity in the degree of involvement in the alleged corruption, antagonistic nature of defenses, and spillover prejudice as reasons to grant individual trials. Although all three defendants express valid concerns as to why they might suffer some prejudice in a joint trial or a bifurcated trial, I conclude that these concerns do not outweigh the considerations of judicial economy, efficiency and the risk of inconsistent verdicts that will be sacrificed if I were to grant individual trials in this case.

On balance and in light of the above factors, I conclude that the government's proposal to sever this case for separate trials of the RICO and non-RICO defendants will minimize the overall potential for prejudice for all parties and maximize reliability of jury judgments about guilt or innocence. At the same time this severance will promote and maintain judicial economy inherent in group trials. Such severance creates two distinct trial groups with each reflecting generally homogeneous interests. I am unwilling, however, to divide this case into smaller groups or to grant individual trials in this case.

I will sever this case into two separate trials with the six RICO defendants—Kennedy, Apelgren, Brown, Byron, Dye, and Helm, to be tried first, followed by the trial of the ten telemarketing defendants—Brock, Cates, Collier, Holtz, Jones, Martin, Oldewage, D. Orick, T. Orick and Upperman.

### B. DEFENDANTS' DISCOVERY MOTIONS

I consider the pending defense motions in the light of the measures already undertaken by the government to facilitate discovery in this case after the indictment was unsealed on July 7, 1992. Immediately thereafter, the government began to separate a set of evidence for designation pursuant to Federal Criminal Rule 16(a)(1)(C).

After organizing this preliminary set of materials, the government filed a "motion for discovery order" prior to the first status conference on August 14, 1992. I considered this motion at the hearing and no defense counsel objected to its contents. Accordingly, I executed the proposed order and permitted the government to make the following materials available for copying through a commercial copy service: 1) documents designated as of that date pursuant to Rule 16(a)(1)(C); 2) the testimony of all witnesses appearing before the grand jury during the investigation of those cases and the grand jury exhibits introduced during that testimony; 3) the client files of 199 clients who had been identified as of that date to testify during the government's case in chief; and 4) all finalized investigative reports of interview conducted during the companion field investigation of those cases. August 14, 1992 Order, pp. 1–2, ¶¶ 1(a)–1(e). The government has complied with this order and the defendants indicated during subsequent discovery proceedings that they have received these materials.

My August 14, 1992 order also permitted the government to make the other materials designated for use as of that date and the remaining documents gathered during the investigation of this case available for ongoing inspection by the defendants and their counsel at 1745 Stout Street (the document repository). The government has provided a tour of this facility to each defense counsel who has requested one. The document repository is estimated to contain over 1,000,000 documents contained in over 800 boxes.

The government has provided the defendants with indices to assist with their inspection of the evidence. Eight of these indices, filed with the court during an October 18, 1992 discovery hearing are of the following: 1) overview of the documents and printouts provided to defense counsel; 2) work product generated by the government during its inventory of 539 boxes of WMC's corporate records; 3) work product generated by the government during its pre-indictment investigation, namely the same corporate records by key word; 4) alphabetical index of the

documents obtained during the investigation which were not otherwise indexed; 5) a list of the 199 WMC clients identified as trial witnesses as of August, 1992; 6) a September 4, 1992 compilation of the grand jury exhibits, organized alphabetically according to the name of the witness through whom they were introduced or the corresponding victim; 7) an alphabetical list of grand jury transcripts; and, 8) alphabetical list of investigative reports.

On November 20, 1992, the government complied with its agreement to designate a set of presently known documents for use as evidence at trial. The government provided a copy of these documents to each defense counsel.

At a December 18, 1992 discovery hearing I concluded on the record that the government had met its *Brady* obligation up to that point. Transcript 12/18/92 at 29. I also found the existing indices adequate to facilitate the discovery process. *Id.* at 38. Based on these findings I denied all pending motions to regulate discovery or to otherwise modify the discovery procedures.

A recent discovery tool, "motions hearing exhibit ten," was filed by the government on April 22, 1993. "Motions hearing exhibit ten" represents the government's best effort to identify records it will use in its ongoing investigation and at trial, as well as those which could be material to the preparation of defenses in this case. The exhibit is basically a catalog, including a general description of the material and its physical location, and, according to the government, covers 15% of the material at the repository.

### 1. Requests for disclosure pursuant to Rule 16:

I note that the government has affirmatively represented that it has provided, or will provide, the following Federal Rule of Criminal Procedure 16 information: 1) prior criminal records of all defendants in this case, including co-defendants who have plead guilty, and all other witnesses; 2) all reports of handwriting analysis; 3) notice of its intent to call expert witnesses—Doug Campbell will be called; 4) a copy of the computer tape of data compiled by the Internal Revenue Service from the invoices of Western Monetary Consultants; 5) work product insofar as it is intended for use in its case-in-chief or will be relied upon by the government's witnesses; 6) reports of interviews; 7) agents' rough notes of interviews which have not been incorporated into a formal report but are discoverable under *Jencks* or *Brady;* and, 8) requests for witness lists. The government further represents that it intends to meet its continuing duty to disclose pursuant to Rule 16(c). Based on these representations, requests for the above listed information will be denied as moot.

■ Defendant's additional discovery requests pursuant to Rule 16 exceed the scope of the rule and will be denied. Specific examples include requests for work product limited by Rule 16(a)(2), and requests by defendants Holtz and Collier for particularization of evidence that the government intends to present to prove a certain fact or to incriminate a certain defendant.

### 2. Requests for *Brady* Material:

■ *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), established that a prosecutor has an affirmative constitutional duty to supply a defendant with exculpatory material known to him or in his possession when such material is specifically requested by the defendant. *Id.* at 87, 83 S.Ct. at 1196. The government's obligation to disclose *Brady* material is contingent on three factors: (a) a request for exculpatory material by the defense; (b) the evidence being favorable to the defense; and (c) the materiality of the evidence. *U.S. v. George,* 778 F.2d 556, 561 (10th Cir.1985). To require disclosure, the defendant must establish that the evidence sought exists, *U.S. v. Davis,* 752 F.2d 963, 976 (5th Cir.1985), that it is both favorable and material, *U.S. v. George,* 786 F.Supp. 56, 58 (D.D.C.1992), and that it has not already been provided. *Strand v. U.S.,* 675 F.Supp. 1283, 1292 (D.Utah 1987), *aff'd,* 865 F.2d 267 (10th Cir.1988).

■ Evidence is "material" only if there is a reasonable probability that, had the evidence been disclosed, the result of the proceeding would have been different. *U.S. v. Bagley,* 473 U.S. 667, 682, 105 S.Ct. 3375,

3383, 87 L.Ed.2d 481 (1985). A "reasonable probability" is a probability sufficient to undermine confidence in the outcome of the proceeding. *Id.* "The mere possibility that an item of undisclosed information might have helped the defense, or might have affected the outcome of the trial, does not establish 'materiality' in the constitutional sense." *U.S. v. Jackson,* 579 F.2d 553, 560 (10th Cir.), *cert. denied,* 439 U.S. 981, 99 S.Ct. 569, 58 L.Ed.2d 652 (1978).

The government has repeatedly represented that it has complied with its *Brady* obligation in this case, and acknowledges its continuing duty to make *Brady* disclosures. Based on this representation, and for the reasons set forth below, defendants' requests for *Brady* material will be denied.

### a) *Identification or compilation of material previously disclosed*

█ Several defendants request the government to compile or specifically identify items furnished pursuant to *Brady.* The government argues that *Brady* does not require the government to "facilitate the compilation of exculpatory material that, with some industry, defense counsel could marshall on their own." *U.S. v. Burger,* 773 F.Supp. 1419, 1426 (D.Kan.1991) (citing *U.S. v. Shoher,* 555 F.Supp. 346, 352 (S.D.N.Y. 1983)). Nevertheless, the government has submitted "motions hearing exhibit ten" in light of my direction at a hearing on March 5, 1993 that the parties consider the unpublished opinion in *U.S. v. McDade,* No. Crim.A. 92–249, 1992 WL 382351 (E.D.Pa. Dec. 11, 1992), in which the district court ordered the government to identify "any discrete parcels of material which it can say conclusively it does not intend to use at trial." *Id.* at *2. The government asserts that it has reviewed in good faith the material at the document repository. The government further asserts that exhibit ten represents its best effort to identify records it will use in its ongoing investigation and at trial, as well as those which could be material to the preparation of defenses in this case. The exhibit is basically a catalog, including a general description of the material and its physical location, and, according to the government, covers 15% of the material at the repository. Thus, consistent with *McDade,* the universe of the government's ongoing investigatory source material is defined by exhibit ten and, by definition, excludes 85% of the material at the document repository. The government certifies that to the extent any of the documents at the repository can be defined as *Brady* material, it will be found listed in exhibit ten. Based on these representations, I will deny defendants' requests that the government further compile or identify previously disclosed *Brady* material.

### b) *Requests for the absence of evidence*

█ Citing *Brady,* many defendants have made broad metaphysical requests for the production of the absence of evidence inculpating them in the crimes charged. *Brady* requires the production of material information which is "favorable to the accused," that is, exculpatory information, not information which is merely, "not inculpatory" and might therefore form the groundwork for some argument for the defendant. *U.S. v. Whitehorn,* 710 F.Supp. 803, 827 (D.D.C.1989), *rev'd on other grounds, U.S. v. Rosenberg,* 888 F.2d 1406 (D.C.Cir.1989). The Tenth Circuit has specifically interpreted the requirement for disclosure of evidence favorable to the defendant to mean evidence which is "expressly exculpatory." *U.S. v. Comosona,* 848 F.2d 1110, 1115 (10th Cir.1988).

The only case cited by defendants for the proposition that *Brady* imposes a constitutional obligation upon the government to disclose what defendants refer to as "negative exculpatory" evidence is *Jones v. Jago,* 575 F.2d 1164 (6th Cir.), *cert. denied,* 439 U.S. 883, 99 S.Ct. 223, 58 L.Ed.2d 196 (1978). In *Jones* the prosecution failed to disclose the statement of an eyewitness to a crime which made no reference to the defendant or his participation. *Id.* at 1168. I find *Jones* to be distinguishable based on its facts in that the court found the negative exculpatory evidence in that case to be a "potentially powerful exculpation." *Id.* Defendants' requests here fall far short of such evidence. Hence, I will deny their request for negative exculpatory information.

### c) *Requests for impeachment material*

The government argues that it has met its obligation to provide impeachment material pursuant to *Giglio v. U.S.*, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972), in large part by making reports of interview and grand jury transcripts available for copying and inspection. In response to specific requests, the government further points out that it has provided the plea agreements of defendants Warren, Tomsick, and Brokaw who will be called as witnesses at trial, and agent reports concerning defendant Martin's participation in consensual taping of telephone calls, including the tape recordings and transcripts of those calls. The government states that it will continue to honor its obligations under *Giglio*, and provide impeachment material consistent with the extent of its obligation under *U.S. v. Abello-Silva*, 948 F.2d 1168 (10th Cir.1991), *cert. denied*, —— U.S. ——, 113 S.Ct. 107, 121 L.Ed.2d 65 (1992).

■ The government objects to defendant Collier's motion that the government be required to produce informants for a meeting. Collier cites no authority which would require the government to compel a potential witness to meet with opposing counsel. I will deny the request.

■ The government also objects to defendant Kennedy's requests for information as to the cost to the government of the investigation of this case, the amount of time spent by agents on this case, for the internal rules of the investigative agencies, and for information regarding any agent having broken the rules. As Kennedy has made no showing that the information he seeks would be impeaching or material, I will deny his requests.

Based on the government's representations that it has already met its obligation to provide impeachment material pursuant to *Giglio v. U.S.*, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972), I will deny defendant's requests for impeachment material as outside the scope of Rule 16 or as moot.

### d) *Requests for evidence of "legitimate" transactions:*

■ Motions by defendants Oldewage, Cates, Kennedy, D. Orick, and T. Orick request information which would show that they acted properly with respect to clients and/or others at Western Monetary Consultants.

In *U.S. v. Marrero*, 904 F.2d 251, 260–61 (5th Cir.), *cert. denied*, 498 U.S. 1000, 111 S.Ct. 561, 112 L.Ed.2d 567 (1990), a prosecution for submitting false claims to a federal agency, failure to disclose a government survey showing that some of the defendants' patients were billed accurately was held not a violation of *Brady* in part because the information was irrelevant. *Id.* Evidence that a defendant engaged in certain legal transactions is generally irrelevant to whether he knew of or participated in other illegal transactions. *U.S. v. Winograd*, 656 F.2d 279, 284 (7th Cir.1981), *cert. denied*, 455 U.S. 989, 102 S.Ct. 1612, 71 L.Ed.2d 848 (1982). In *Winograd*, it was held that the district court did not err in refusing to admit evidence offered by the defendant showing that he properly entered into many contracts. *Id.* at 284. Similarly, in *U.S. v. Quintanilla*, 760 F.Supp. 687 (N.D.Ill.1991), a defendant's request for disclosure of any person having denied knowledge of any criminal activity on the part of the defendant, or who had attested to the defendants' honesty, good character, and/or lack of criminal wrongdoing, who has stated that the defendant did not participate in illegal or improper practices in connection with a particular organization was held to exceed the scope of *Brady*. *Id.* at 697. Here, too, I find defendant's requests exceed the scope of *Brady*.

For the same reason, I will deny defendant Cates' request for evidence of Western Monetary customers serviced by him who received their metals. Further, the government points out that the files of Western's customers are available to defendants, as are printouts which list the transactions by consultant, from which Cates can determine for himself which of his customers received metals.

### e) *Requests for agents' reports and notes*

Defendant Jones requests disclosure of "all reports, memoranda, interview summaries, or other documents prepared by agents or federal agency relative to his or her involvement or lack thereof in any activities alleged to be the basis of the indictment in this case...." *See* Defendant Jones' motion for discovery of exculpatory material, ¶ 1. In response, the government states that agents' reports of interviews have been and will be disclosed and agents' notes which have not been incorporated into formal reports, but which constitute *Brady* material will be disclosed. To this extent, defendant Jones' request will be denied as moot, otherwise it will be denied as it exceeds the scope of Rule 16.

### f) *Requests for verifiable record of compliance*

■ Defendant Byron has requested that "the government be required as part of its compliance to detail in writing how it has responded to the foregoing requests to provide a verifiable record of its discovery compliance." *See* Motion of defendant Byron for discovery, pp. 5–6. Defendant Dye makes a similar request. *See,* Defendant Dye's motion for production of evidence favorable to defendant, p.1. As grounds for this request the defendants allege the government's lack of good faith in disclosing *Brady* material. The government argues that this request has no merit and should be denied. I agree.

### g) *Requests for information relating to legal representation and accounting or business advice and services*

Defendants Dye, Helm, and Kennedy request information relating to legal representation. Defendant Helm also requests all documents relating to or reflecting accounting, financial, or business management advice, opinion, or services. The government represents that such material in its possession has already been made available with the exception of two boxes of documents received from Gary Handy that have been sealed pending a determination of defendant Kennedy's assertion of attorney/client privilege. Based on the government's representation, I will deny these requests as moot.

### 3. Requests for *Jencks* Material:

Several defendants have made specific requests for statements of witnesses pursuant to 18 U.S.C. § 3500. The government represents that all *Jencks* material has been provided. According, I will deny these requests as moot.

### 4. Dye motion for subpoena duces tecum:

Upon defendant Dye's representation at the April 23, 1993 hearing, his motion for issuance of a subpoena *duces tecum* will be denied as moot.

## C. GOVERNMENT'S PRE–TRIAL MOTIONS

### 1. Motion for reciprocal discovery pursuant to Rule 16:

■ The government requests the following discovery pursuant to Rule 16(b) on the basis that it is entitled to reciprocal discovery as a matter of right. *See generally,* 2 CHARLES A. WRIGHT, FEDERAL PRACTICE AND PROCEDURE § 255 n. 11 (1982):

a. permission to inspect and copy or photograph all books, papers, documents, photographs, tangible objects, or copies or portions thereof, which are within the possession, custody, or control of the defendants and which the defendants intend to introduce as evidence in chief at trial;

b. permission to inspect and copy or photograph all results or reports of physical or mental examinations and of scientific tests or experiments made in connection with this case, or copies thereof, within the possession or control of the defendants, which the defendants intend to introduce as evidence in chief at trial or which were prepared by a witness whom the defendants intend to call at the trial if the results of these reports relate to that witness' testimony.

I will grant the governments' requests and give defendants until and including June 25, 1993, to provide the government with reciprocal discovery.

### 2. Motion for pre-trial ruling pursuant to Rules 703 and 1006:

The government intends to use the expert testimony at trial of Douglas Campbell of the

National Futures Association to substantiate allegations of the indictment and to show that Western Monetary Consultants sold substantially more metal to its clients than it purchased to cover these sales. Pursuant to the court's August 14, 1992, discovery order, the government provided the defendants with a statement by Mr. Campbell.

█ Expert and summary testimony is appropriate in complex criminal cases, both to explain the practices and courses of dealing in a particular industry or activity, and to describe the components or characteristics of a particular type of criminal scheme. *See, e.g., U.S. v. Pinelli,* 890 F.2d 1461, 1474-75 (10th Cir.1989), *cert. denied,* 495 U.S. 960, 110 S.Ct. 2568, 109 L.Ed.2d 750 (1990); *U.S. v. Mann,* 884 F.2d 532, 539 (10th Cir.1989); *U.S. v. Kapnison,* 743 F.2d 1450, 1457-58 (10th Cir.1984), *cert. denied,* 471 U.S. 1015, 105 S.Ct. 2017, 85 L.Ed.2d 299 (1985).

█ Pursuant to D.C.Colo.L.R. 7.1(A), the government has proposed a stipulation that Mr. Campbell be allowed to testify about this data pursuant to Federal Rule of Evidence 703 without admitting the data. The defendants have this stipulation under consideration.

In the alternative, the government moves to proceed under Federal Rule of Evidence 1006 which provides:

> The contents of voluminous writings, recordings, or photographs which cannot conveniently be examined in court may be presented in the form of chart, summary, or calculation. The originals, or duplicates, shall be made available for examination or copying, or both, by other parties at reasonable time and place. The court may order that they be produced in court.

The government has provided defendants with Campbell's summary charts and is willing to proceed on the basis of the charts alone. The underlying data has been identified discretely and segregated for defense inspection and copying at the document repository. I find that the reasonable time and place component of Federal Rule of Evidence 1006 has thus been satisfied. The government requests that I order the data underlying Mr. Campbell's conclusions be produced

in court but not be introduced into evidence. MICHAEL H. GRAHAM, FEDERAL PRACTICE AND PROCEDURE § 7031 n. 6 (1992) (citing *U.S. v. Strissel,* 920 F.2d 1162, 1163 (4th Cir.1990)).

Based on the representation of the government that the summary charts and the information underlying the summary charts have been made available to the defendants, I will grant the government's request and order that the data underlying Mr. Campbell's conclusions be produced in court but not introduced into evidence. This ruling does not preclude any party from offering specific documents from the Rule 1006 source material necessary on direct or cross examination of the expert.

### 3. Motion for departures from local rules of practice:

The government moves that I grant two departures from the local rules of practice. Defendants do not object to these requests and they will be granted.

First, the government requests that it be allowed to modify the requirement, found in paragraph three of this court's *Checklist for Trial,* that all exhibits be numbered sequentially. Specifically, the government proposes to mark exhibits relating directly to former clients of Western Monetary Consultants by noting the client's name on the exhibit label, and numbering each exhibit relating to that client sequentially. The government posits that this procedure would enable the jury, the court, and all parties to easily relate the exhibit evidence to specific counts and racketeering acts in the indictment.

█ Second, the government requests that the court relieve the parties from full compliance with Local Rule 7.1(A) which requires that before any motion is filed in this court, counsel for the moving party make a reasonable, good faith effort to confer with opposing counsel to resolve the disputed matter. The government contends that it is virtually impossible to contact 25 trial lawyers prior to filing pleadings, let alone obtain a meaningful informal consensus among them on substantive issues. Again, I agree. Although I agree that the local rule should be waived, I encourage compliance with its spirit whenever possible.

4. **Motion for order authorizing designation of additional trial exhibits:**

The government's motion for designation of additional trial exhibits filed April 22, 1993 will be granted.

Accordingly, it is ORDERED that:

1) the government's motion for severance is GRANTED;

2) the severance motions of defendants Brown, Byron, Dye, Oldewage, D. Orick, and T. Orick are DENIED;

3) defendants' various motions for discovery are either DENIED as moot, having been satisfied; DENIED as beyond the scope of Rule 16; DENIED as beyond the scope of *Brady;* or DENIED for lack of authority, all in accordance with the foregoing views expressed in this ORDER;

4) defendants shall provide reciprocal discovery to the government by June 25, 1993;

5) the data underlying government expert, Douglas Campbell's conclusions shall be produced in court but not introduced into evidence.

6) the government's request for departures from the exhibit requirement found in *Checklist for Trial* and from Local Rule 7.1(A) is GRANTED;

7) the government's motion for order authorizing designation of additional trial exhibits is GRANTED;

8) the government shall provide an exhibit list for the first trial in this case within 30 days.