UNITED STATES of America, Plaintiff–Appellee,

v.

William R. KENNEDY, Jr., Defendant–Appellant.

No. 94–1026.

United States Court of Appeals, Tenth Circuit.

Aug. 30, 1995.

Hamilton P. Fox, III of Sutherland, Asbill & Brennan, Washington, DC (Lovida H. Coleman, Jr. and Kevin P. Jenkins of Sutherland, Asbill & Brennan, with him, on the brief) for defendant-appellant.

Linda S. Kaufman, Asst. U.S. Atty., Denver, CO (Henry L. Solano, U.S. Atty., with her, on the brief) for plaintiff-appellee.

Before BALDOCK, McKAY, and EBEL, Circuit Judges.

EBEL, Circuit Judge.

Defendant–Appellant William R. Kennedy, Jr. ("Kennedy") was charged in a 109–count indictment for a massive scheme to defraud precious metals investors. A jury convicted Kennedy of one count of racketeering, 18 U.S.C. §§ 1962(c) & 1963, nine counts of mail fraud, 18 U.S.C. §§ 1341 & 2 (aiding and abetting), and seven counts of money laundering, 18 U.S.C. §§ 1956(a)(1)(A)(i) & 2 (aiding and abetting). Kennedy challenges his convictions in this direct appeal, arguing that: (1) the district court abused its discretion under the Criminal Justice Act and violated his Fifth Amendment due process rights by denying his requests for additional support services; (2) he received ineffective assistance of counsel in violation of the Sixth Amendment; (3) insufficient evidence supported eight of his nine mail fraud convictions; (4) his money laundering convictions were based on a legally inadequate indictment, improper jury instructions, and insufficient evidence; and (5) the court erred by excluding certain evidence at trial. We exercise jurisdiction under 28 U.S.C. § 1291 and affirm in all respects.

## BACKGROUND

In 1979, Kennedy helped found Western Monetary Consultants, Inc. ("WMC"). He served as WMC's president from the corporation's inception through his indictment in this case. WMC marketed itself as a largescale seller of precious metals and coins. Through various literature mailings and a series of seminars, referred to as "war colleges," WMC advocated the purchase of tangible precious metals as a hedge against inflation caused by certain world events. Investors could purchase the metals from WMC either through cash transactions or through cash down-payments coupled with bank-financed loans.

When an investor agreed to purchase a certain quantity of metal from WMC, a WMC consultant would quote the investor an approximate price. The consultant would then contact the WMC trading department, which would locate the best price for the metal from one of its dealers. The consultant would then inform the investor of the exact price, which was to be "locked-in" at that point in time, and the investor would then transfer funds to WMC via check, often supplemented with funds from a bank loan. If WMC did not in turn provide the dealer with the purchase price within 48 hours of ordering, the dealer typically nullified the contract with WMC, requiring WMC to reorder at a new price.

Between 1984 and 1987, WMC increased its sales rapidly and began to experience serious cash shortages. Kennedy nevertheless continued to promote sales to new investors, without informing them that WMC was between ten to thirteen million dollars behind in filling backlogged orders. By March of 1988, WMC's cash shortages were so great that WMC filed for Chapter 11 bankruptcy protection, listing over 600 creditors from whom WMC had received over $18,000,000 towards orders that remained unfilled. *United States v. Kennedy,* 819 F.Supp. 1510, 1513 (D.Colo.), *aff'd, United States v. Byron,* 994 F.2d 747 (10th Cir.1993). WMC continued to operate thereafter under a confirmed reorganization plan.

In July of 1992, after a five year investigation of WMC's practices, the government indicted Kennedy and numerous other WMC participants. The 109–count indictment against Kennedy alleged a massive Ponzi scheme to defraud numerous precious metals investors. The government alleged that when WMC "locked-in" a price for an investor, it did so under the false pretenses that it would purchase the investor's metal immedi-

ately. However, rather than purchasing immediately, the government alleged that WMC frequently delayed purchases or failed to fill orders altogether. Specifically, the government alleged that WMC diverted many investors' funds to other uses, including speculating in futures markets, operating the *Conservative Digest* magazine, and financing personal endeavors.

Because Kennedy was indigent, the court appointed him counsel in August, 1992, one year before Kennedy's trial in August, 1993. During pretrial discovery, the government provided the defense access to the 800 bankers boxes of documents that it had amassed during its investigation, 539 of which contained WMC records. The boxes were placed in a repository in two rooms of a government building in Denver, Colorado, and were available for viewing as of August 14, 1992.

During this pretrial period, Kennedy's counsel made numerous requests for additional support services to supplement the services of his one paralegal assistant. The court granted Kennedy funds for an investigator, and funds to retain Philip Bolles ("Bolles"), who had served as WMC's chief financial officer from 1989 to 1992 and was an expert on the inner workings of WMC. The court additionally authorized funds for Kennedy to hire Ray Thomas ("Thomas") as an expert witness on the metal industry, and to hire Richard McCormack ("McCormack") as an expert witness on Ponzi schemes. On December 15, 1992, the court also appointed a co-counsel to work on Kennedy's case.

However, the court denied Kennedy's request for additional paralegals to help review and index the 800 boxes of documents. The court also denied Kennedy's request for airfare to fly himself and Bolles from California to Denver to prepare for trial. And the court denied Kennedy's request to hire the accounting firm, Arthur Anderson, to audit WMC's financial records and to review the conclusions and analysis of one of the government's key expert witnesses. Five months before trial, Kennedy moved to dismiss the indictment altogether, arguing that his inability to obtain these resources prevented him from adequately defending his case. The

court denied the motion and the case went to trial in August, 1993.

At trial, the government relied in part on the testimony of Douglas Campbell ("Campbell"), from the National Futures Association, as an expert on precious metals and commodity markets. Campbell concluded from reviewing WMC's records that WMC had not purchased enough metal to cover its obligations to numerous investors and had lost money speculating in metals futures trading. The government also called numerous individual investors to testify about the losses they had suffered by investing in WMC. Kennedy's primary defense to these allegations was that WMC had failed to fill investors' orders not because of fraud, but simply because of poor business practices and mismanagement. The jury, however, ultimately was persuaded by the government's case and convicted Kennedy of one racketeering count, nine mail fraud counts, and seven money laundering counts. Kennedy now appeals those convictions, and we affirm.

## DISCUSSION

In this appeal, Kennedy challenges his convictions on numerous grounds. First, Kennedy argues that the district court's denial of some of his requests for additional support services rendered him unable to defend himself in violation of the Criminal Justice Act and his Fifth Amendment due process rights. Second, Kennedy argues that he was provided ineffective assistance of counsel in violation of the Sixth Amendment. Third, he contends that the government presented insufficient evidence to support eight of his nine mail fraud convictions. Fourth, he argues that his money laundering convictions were based on a legally inadequate indictment, improper jury instructions, and insufficient evidence. Lastly, he argues that the court committed reversible error by excluding evidence of specific WMC investors who had not lost money investing in WMC. We address and reject each of these contentions in turn.

## I. Denial of Support Services

Kennedy first argues that the district court erred in denying his requests for para-

legals, airfare for himself and Bolles to fly to Denver to prepare for trial, and the services of the Arthur Anderson accounting firm. Kennedy asserts that without these resources he was unable to defend himself at trial. Accordingly, he argues that the court violated his rights under the Criminal Justice Act ("CJA") and the Fifth Amendment Due Process Clause.

## A. Criminal Justice Act, 18 U.S.C. § 3006A

■■■ The CJA creates a plan for furnishing representation to those who lack the financial ability to obtain it on their own. In relevant part, it provides that

> [c]ounsel for a person who is financially unable to obtain investigative, expert, or other services *necessary for adequate representation* may request them in an ex parte application. Upon finding, after appropriate inquiry in an ex parte proceeding, that the services are *necessary* and that the person is financially unable to obtain them, the court ... shall authorize counsel to obtain the services.

18 U.S.C. § 3006A(e)(1) (emphasis added). In order to obtain services under this provision, the defendant must do more than allege that the services would be helpful. *United States v. Ready,* 574 F.2d 1009, 1015 (10th Cir.1978). The defendant bears the burden of showing that the requested services are "necessary" to present an adequate defense. *United States v. Greschner,* 802 F.2d 373, 376 (10th Cir.1986), *cert. denied,* 480 U.S. 908, 107 S.Ct. 1353, 94 L.Ed.2d 523 (1987). The denial of such a request is reviewed only for an abuse of discretion. *United States v. Nichols,* 21 F.3d 1016, 1017 (10th Cir.), *cert. denied,* —— U.S. ——, 115 S.Ct. 523, 130 L.Ed.2d 428 (1994).

Kennedy challenges the district court's denial of resources on two grounds. First, he argues that the court abused its discretion generally by basing its CJA decisions at least in part on a lack of available funds, rather than on the necessity of the requested resources. *See* 18 U.S.C. § 3006A(e)(1) (providing that if the services are necessary, they "shall" be authorized). Second, he argues that the court abused its discretion in its

specific findings of lack of necessity for each of the three requested resources at issue. We find it unnecessary to address the first question of whether or not the district court relied on financial concerns or the propriety of so doing, because we conclude that Kennedy failed to meet his burden of showing the necessity of the three requested resources at issue, which we address in turn.

*1. Additional Paralegals.* Kennedy first asserts that the court erred in denying his request for additional paralegals to help review and index the contents of the 800 boxes in the government's repository. He argues that without the assistance of paralegals, his counsel was unable to review all of the existing documents before trial, and, therefore, he may have been deprived of the opportunity to discover valuable evidence for his defense.

These general allegations, without any specific showing of what the additional paralegals might have found and how it would have affected his representation, fail to demonstrate that the court's denial of paralegals was an abuse of discretion. *See United States v. Mundt,* 508 F.2d 904, 908 (10th Cir.1974), *cert. denied,* 421 U.S. 949, 95 S.Ct. 1682, 44 L.Ed.2d 103 (1975) (requiring defendant "to show specifically the reasons why such services are necessary" and "to state what he expected specifically to find" through the use of such services). Kennedy's counsel and his counsel's one paralegal had access to the repository documents a full year before the August, 1993 trial. Kennedy also had the assistance of co-counsel who was appointed approximately eight months before trial, and an investigator for whom he was authorized to spend up to $10,000. Kennedy also could rely on the assistance of Bolles, despite Bolles' failure to visit the repository in person, because Bolles had "intimate familiarity" with many of the repository documents from serving as WMC's former CFO.

In addition, as the district court noted, the government provided "extraordinary" assistance during discovery, "both in bulk, in summary form, in index form, [and] in work product," to enable the defense to review the repository materials efficiently. In conjunction with making the evidence accessible to the defense as of August, 1992, the govern-

ment provided Kennedy with copies of some of the documents through a commercial copy service.[1] *Kennedy*, 819 F.Supp. at 1517. The government also gave Kennedy an inventory list and indices of the contents of the repository boxes.[2] *Id.* at 1517–18. In November, 1992, the government additionally provided Kennedy copies of all then-known documents that it intended to use at trial. *Id.* at 1518. And in April, 1993, the government specifically designated for Kennedy all of the evidence that it reserved the right to use at trial, and all of the evidence that it deemed to be material to the defendant's case, which involved only about 15 percent of the 539 boxes containing records from WMC. *Id.* at 1518–19. This designation included a date and general description of each item, along with its physical file location. *Kennedy*, 819 F.Supp. at 1519.

■ Kennedy counters these facts by arguing that it is inappropriate to consider the resources provided by the government when judging the necessity of additional paralegals. Specifically, Kennedy argues that having to rely on his adversary's work product and assessments of what documents it anticipated would be material to his case is not an acceptable substitute for resources to personally review all of the potential evidence that existed.[3] we find this argument unpersuasive. The district court did not rely on the government's efforts as a substitute for providing adequate resources to Kennedy; it simply noted the extraordinary discovery materials that were provided to Kennedy when assessing the magnitude of Kennedy's task. Viewed against the backdrop of discovery, the assistance that the court did provide Kennedy to investigate the evidence, and Kennedy's failure to show how additional paralegals would have affected his representation, we find no abuse of discretion in the court's denial of paralegals.

■ *2. Airfare for Trial Preparation.* Kennedy asserts, secondly, that the court erred in denying his request for funds to fly himself and Bolles from California to Denver to prepare for trial. Kennedy claims that without court-authorized airfare, neither he nor Bolles were able personally to review the documents in the repository and assist in preparing a defense. Kennedy also points out that Bolles' credibility was attacked during cross-examination because he had not visited the repository in person.

Again we find no abuse of discretion. The district court noted that 18 U.S.C. § 4285 authorized it to provide travel expenses for a defendant to attend court appearances, but not to prepare for trial. We agree, and also note that Kennedy did not demonstrate the necessity of his presence in Denver before trial. *See* R.O.A.Supp.Vol. 14 (*ex parte* motion of 5/10/93) (making only conclusory allegation that airfare was "essential ... in order to prepare for trial"). With respect to Bolles, the court's order explained that although it was denying advance funding, Bolles was authorized to "travel to Denver

---

1. The copied documents included those designated under Rule 16(a)(1)(C) as of August 14, 1992, the testimony of all grand jury witnesses and all grand jury exhibits, files of 199 WMC clients identified to testify in the government's case in chief as of August 14, 1992, and all finalized investigative reports. *Kennedy*, 819 F.Supp. at 1517.

2. The indices included, among others:
 1) [an] overview of the documents and print-outs provided to defense counsel; 2) work product generated by the government during its inventory of 539 boxes of WMC's corporate records; 3) work product generated by the government during its pre-indictment investigation, namely the same corporate records by key word; 4) alphabetical index of the documents obtained during the investigation which were not otherwise indexed; 5) a list of the 199 WMC clients identified as trial witnesses as of August, 1992; 6) a September 4, 1992

compilation of the grand jury exhibits, organized alphabetically according to the name of the witness through whom they were introduced or the corresponding victim; 7) an alphabetical list of grand jury transcripts; and 8) alphabetical list of investigative reports. *Kennedy*, 819 F.Supp. at 1517–18.

3. Although Kennedy cites to the principles in *United States v. Agurs*, 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976), and *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), to support his contention that the government is not competent to determine on its own what evidence may be exculpatory or relevant to the defendant's case, we note that he does not assert a *Brady* violation, nor does he assert a failure to comply with disclosure obligations under Fed.R.Crim.P. 16(a)(1)(C). Aplt's Br. at 20; Aplt's Rep.Br. at 9.

and assist counsel and claim these fees and expenses on his CJA form," a choice that would have enabled him to avoid a credibility attack. R.O.A.Supp.Vol. 14 (order of 5/11/93). Thus, we find no impediment to Kennedy's defense.

*3. Accounting Services.* Kennedy's final assertion is that the court abused its discretion by denying his request for funds to retain the services of the Arthur Anderson accounting firm. Kennedy requested the services primarily for two reasons. First, he wanted Arthur Anderson to conduct a complete audit of WMC's records to establish whether, to what extent, and by whom any losses had been suffered. Kennedy contends this was necessary to establish his defense that WMC failed to fulfill its obligations because of mismanagement, and not because of fraud. Second, Kennedy argued that he needed accounting expertise in order to counter the testimony of the government's expert witness, Campbell, who concluded that WMC had not purchased sufficient metal to cover its obligations to investors and had lost money trading in metals futures. Kennedy contends that an accounting firm was necessary adequately to review the data upon which Campbell relied, to help analyze Campbell's conclusions about the existence of a Ponzi scheme, to prepare for Campbell's cross-examination, and to present expert rebuttal testimony. Kennedy claims that authorizing funds to retain Bolles to perform these tasks was inadequate because Bolles had let his accounting license lapse, he was not an expert in the metals industry, he did not personally review the documents in the repository, and his credibility was open to attack due to his close relationship with Kennedy and WMC.

■ Once again, we conclude that the court did not abuse its discretion by denying the accounting services because Kennedy did not demonstrate their necessity to his representation. The court provided Kennedy with adequate tools both to present his mismanagement defense and to counter Campbell's testimony, without the assistance of Arthur

Anderson to conduct a sweeping audit that was "undefined as to nature or scope." R.O.A.Supp.Vol. 14 (order of 5/4/93 at 4).

To the extent that Kennedy requested Arthur Anderson's services to assess WMC's losses, we agree with the district court that the services were unwarranted. As the district court explained, "Kennedy offer[ed] no basis for questioning either the amount of loss reported by the government data or which clients suffered the loss," but merely alleged that "true data" would show that he was not a criminal. R.O.A.Supp. Vol. 14 (order of 5/4/93 at 4–5). Moreover, the requested information on losses was already available to Kennedy in WMC's bankruptcy schedules. R.O.A.Supp. Vol. 14 (order of 5/4/93 at 5); *see United States v. Aldridge,* 484 F.2d 655, 660 (7th Cir.1973) (affirming denial of request for accountant to determine amount of money defendant received from a trust from which he was accused of self-dealing because the information was available through other documentary evidence), *cert. denied,* 415 U.S. 921, 94 S.Ct. 1423, 39 L.Ed.2d 477 *and* 415 U.S. 922, 94 S.Ct. 1423, 39 L.Ed.2d 477 (1974).

To the extent that Kennedy requested accounting expertise to help counter Campbell's testimony, we first note that Campbell himself does not appear to be a certified accountant.[4] Campbell's conclusions about WMC were based on a review of WMC corporate financial records, which were contained in the government repository, and his expertise in precious metals and commodities markets. The need for expert accounting was thus unclear. The defense had access to the financial records upon which Campbell relied, including summary charts of the underlying data. The defense also had the services of three individuals with knowledge in relevant fields of expertise. Although Bolles was a "financial and management professional," rather than an expert in precious metals or commodities markets, he was qualified to analyze WMC's inner-workings and financial condition, having served as WMC's chief financial officer from 1989 to 1992, and

---

**4.** Campbell testified only that he had a B.S. degree in business administration with a specialization in accounting.

having spent some 400 hours analyzing data to prepare for trial. R.O.A.Supp.Vol. 14 (order of 5/4/93 at 3); Vol. 47 at 5181. Moreover, the defense was provided with $5000 to retain Thomas, a qualified expert in the metals industry,[5] and $200 per hour up to $7,500 to retain McCormack, a qualified expert on Ponzi schemes.[6] Given these resources, there is no showing that the lack of additional accounting services prevented Kennedy from presenting his defense or countering Campbell's testimony at trial. *Cf. Ready,* 574 F.2d at 1015 (finding no abuse of discretion in denying defendant a tax expert in a tax fraud prosecution where there was no indication that expert could have benefitted the defense); *Aldridge,* 484 F.2d at 660 (holding that funds for an accountant were appropriately denied where defendant did not show that lack of an accountant prejudiced his case).

Thus, we conclude that the district court did not abuse its discretion under the CJA in denying Kennedy funds for additional paralegals, airfare, or the services of an accounting firm.

## B. Due Process

■ Kennedy also argues that the district court's denial of these resources violated his Fifth Amendment due process rights. The Fifth Amendment's guarantee of fundamental fairness entitles indigent defendants to a fair opportunity to present their defense at trial. *See Ake v. Oklahoma,* 470 U.S. 68, 76, 105 S.Ct. 1087, 1092–93, 84 L.Ed.2d 53 (1985). This requires that indigent defendants receive the "'basic tools'" and the "raw materials integral to" the presentation of an adequate defense. *Id.* at 77, 105 S.Ct. at 1093 (quoting *Britt v. North Carolina,* 404 U.S. 226, 227, 92 S.Ct. 431, 433–34, 30 L.Ed.2d 400 (1971)). Kennedy argues that

additional paralegals, airfare, and an accounting firm were among the "basic tools" necessary to defend himself in this complex fraud prosecution. For largely the same reasons noted above, we disagree.

■ An indigent defendant is not entitled to all the assistance that a wealthier counterpart might buy, but rather only to the basic and integral tools. *Id.* To determine what basic tools are required, we consider three factors: (1) the effect on Kennedy's private interest in the accuracy of the trial if the requested service is not provided; (2) the burden on the government's interest if the service is provided; and (3) the probable value of the additional service and the risk of error in the proceeding if such assistance is not offered. *See id.* at 78–79, 105 S.Ct. at 1093–94. In this case, the third factor is dispositive, because Kennedy has not shown the value of the requested services or how their denial caused him any substantial prejudice at trial. *See Coleman v. Brown,* 802 F.2d 1227, 1237 (10th Cir.1986), *cert. denied,* 482 U.S. 909, 107 S.Ct. 2491, 96 L.Ed.2d 383 (1987); *see also Greschner,* 802 F.2d at 377 (requiring deprivation of a substantial benefit at trial).[7]

In *Coleman,* 802 F.2d at 1237, we held that a defendant's allegations "that his attorney was overworked, that many witnesses were involved in the case, and that the state's resources far surpassed those of the defense" were insufficient to show that the denial of an investigator violated the defendant's due process rights. Kennedy's conclusory allegations about the potential impact of additional paralegals, airfare, and accounting services are, as discussed above, similarly lacking. In particular, we note that although Bolles may not have been as effective as an independent accounting firm at presenting Kennedy's primary defense—that WMC losses were due to

---

**5.** Although the court noted that Thomas would be important specifically to respond to testimony from former WMC employees about Kennedy's deviation from industry norms, rather than to respond to Campbell, Thomas was retained and qualified for his general expertise in the metals industry.

**6.** We also note that one of Kennedy's witnesses, Lloyd Evan Qualls, had a master's degree in accounting and was employed as an auditor,

although Kennedy did not call him to testify based on his accounting expertise.

**7.** We also note that the burden on the government was not insignificant. Kennedy was seeking $18,000 merely to enable Arthur Anderson to assess how much money it then would need to conduct the audit that Kennedy requested. R.O.A. Supp.Vol. 14 (order of 5/4/93 at 5).

mismanagement rather than fraud—Bolles was able to articulate this defense to the jury, and it was corroborated by other defense witnesses at trial. *Cf. Greschner,* 802 F.2d at 377 (finding that denial of court-appointed penologist did not violate Fifth Amendment in part because defendants elicited the same testimony from other witnesses). When viewed in combination with the other witnesses that Kennedy was provided funds for, we cannot conclude that he was denied any of the basic tools for presenting an adequate defense.[8] Accordingly, we reject Kennedy's claim that the court's denial of resources violated his due process rights.

## II. Ineffective Assistance of Counsel

Kennedy also argues that he was provided ineffective assistance of counsel in violation of his Sixth Amendment rights. Specifically, Kennedy claims that his counsel was ineffective because of: (1) his inexperience in complex fraud cases and his lack of court-authorized resources; (2) inadequate time spent reviewing the repository documents; (3) inadequate time spent consulting with Kennedy; (4) inadequate time spent consulting with and preparing expert witnesses; and (5) mishandling the examination of his expert witness, McCormack, at trial.[9]

Based on this court's reasoning in *United States v. Galloway,* we hold that Kennedy's ineffectiveness claim should be brought on collateral review. 56 F.3d 1239, 1240 (10th Cir.1995) (en banc) ("Ineffectiveness claims brought on direct appeal are presumptively dismissible, and virtually all will be dismissed.") While we noted in *Galloway* that "in rare instances an ineffectiveness of counsel claim may need no further development prior to review on direct appeal," *id.,* this is not one of those exceptional cases. The bulk of Kennedy's arguments concerning his counsel's performance require precisely the type of factual determinations contemplated by *Galloway* as beyond the scope of the record on direct review—e.g., assessments of what counsel did and did not do to prepare for trial, what he would or would not have found had he spent more time on various tasks, and whether the "mishandled" expert examination could be attributed to a fickle witness or an intentional trial strategy. Because any aspects of Kennedy's argument that already may be developed in the record are inextricably intertwined with other aspects of his argument, it is far more efficient to address the ineffectiveness claim in its entirety with the benefit of a full record before a district court on collateral review. *See id.* at 1241 ("[A]n ineffectiveness claim may be viewed as unitary, regardless of the number of separate reasons advanced in support of the claim. A unitary claim by definition cannot easily be split into two proceedings on any logical basis."). Accordingly, we dismiss Kennedy's claim of ineffective assis-

---

8. In this regard, we distinguish the cases in which the denial of an expert psychiatrist was deemed a due process violation. Those cases recognized that when the defendant's mental state is an important issue and is seriously in question, and when obtaining an accurate assessment of that mental state is uniquely dependant on psychological expertise, an expert psychiatrist indeed becomes a basic and integral tool to presenting an adequate defense. *See, e.g., Ake,* 470 U.S. at 74, 80–83, 105 S.Ct. at 1091–92, 1094–96 (holding that due process entitled indigent defendant to psychiatrist to present insanity defense and cross-examine state psychiatrists because of the tremendous reliance jurors place on psychiatric testimony where "there is often no single, accurate psychiatric conclusion on legal insanity"); *United States v. Sloan,* 776 F.2d 926, 928–29 (10th Cir.1985) (holding that due process entitled indigent defendant to psychiatrist to present defense of lack of capacity to form specific intent and to cross-examine government's psychiatrist on this point); *see also Dunn v. Roberts,* 963 F.2d

308, 314 (10th Cir.1992) (finding due process violation where denying expert on battered women's syndrome prevented defendant from presenting information on specific intent, an essential element of the crime).

9. Kennedy also incorporates into his ineffectiveness claim many of the other substantive challenges that he raises in this appeal. In particular, Kennedy asserts that counsel performed ineffectively by failing: (1) to renew his motion to dismiss the indictment for inadequate resources to present a defense; (2) to move to dismiss the money laundering counts for insufficient evidence or to submit an alternative jury instruction; and (3) to join his co-defendants in objecting to the court's refusal to admit evidence of investors who did not sustain losses. Because we address and reject all these substantive claims directly in Parts I, IV, and V of this opinion, they cannot form the basis of an ineffectiveness claim.

tance of counsel without prejudice to Kennedy's right to raise it again in a collateral proceeding.

## III. Mail Fraud Convictions

 Kennedy next contends that there was insufficient evidence at trial to support eight of his nine mail fraud convictions. We therefore review the entire record in the light most favorable to the government to determine whether a reasonable jury could find guilt beyond a reasonable doubt, based on the direct and circumstantial evidence and all reasonable inferences therefrom. *United States v. Davis,* 1 F.3d 1014, 1017 (10th Cir.1993).

The mail fraud statute under which Kennedy was convicted provides in relevant part:

Whoever, having devised or intending to devise any scheme or artifice ... for obtaining money or property by means of false or fraudulent pretenses, representations, or promises,[10] ... for the purpose of executing such scheme or artifice or attempting so to do, places in any post office or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the Postal Service, ... or takes or receives therefrom, any such matter or thing, or knowingly causes to be delivered by mail ... according to the direction thereon, ... shall be fined under this title or imprisoned not more than five years, or both.

18 U.S.C. § 1341. The government alleged that Kennedy devised WMC as a scheme for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, which included, most significantly, explicit or implied promises to lock-in metal prices at the time investors ordered metal and to purchase the metal immediately. Each of the individual mail fraud convictions was predicated on different

named investors who were the addressees of specific mailings sent from Kennedy or WMC to execute this scheme.

Kennedy's narrow contention on appeal is that the government did not present sufficient evidence from which a jury could find that the false promises to lock-in a price upon ordering and to use investors' funds to purchase metal immediately were ever *made directly to the individuals named* in eight of the mail fraud counts. Kennedy points out that five of these named addressees did not testify at trial, and those that did testify only explained their understanding of WMC's purchasing procedures, rather than the representations that were actually made to them. Without such evidence, Kennedy argues that the mail fraud convictions cannot stand. Because we disavow Kennedy's underlying premise that the government had to prove that misrepresentations were made directly to each named investor, we disagree.

 To prove a violation of the mail fraud statute, the government must prove three things: (1) the devising of a scheme or artifice either (a) to defraud or (b) for obtaining money by means of false or fraudulent pretenses, representations, or promises, (2) the specific intent to defraud, and (3) the use of the United States mails to execute the scheme. *See Williams v. United States,* 368 F.2d 972, 975 (10th Cir.1966), *cert. denied,* 386 U.S. 997, 87 S.Ct. 1317, 18 L.Ed.2d 345 (1967). Based on the plain language of the statute, this court made clear in *Graham v. United States,* 120 F.2d 543, 544 (10th Cir. 1941), that the central focus of the first element is the existence of a scheme.[11] "It is not the making of the false pretenses, representations, or promises that constitutes the first element of the offense," we explained, "[i]t is the devising or intending to devise the scheme." *Id.* Accordingly, we concluded that it was "neither necessary to allege nor

---

**10.** This statute also prohibits schemes or artifices "to defraud." 18 U.S.C. § 1341; *see United States v. Cronic,* 900 F.2d 1511, 1513 (10th Cir. 1990) (distinguishing between a scheme to defraud and a scheme to obtain money by false pretenses). However, Kennedy was only charged with devising a scheme for obtaining money or property by means of false or fraudulent pretenses, representations, or promises.

**11.** Technically, *Graham* was interpreting 18 U.S.C. § 338, the predecessor to the current mail fraud statute found at 18 U.S.C. § 1341. *Graham,* 120 F.2d at 544. However, the content of the statutes are the same. *Id.*

prove that the false pretenses, representations, or promises were actually made" to anyone, much less to each individual in the distinct mail fraud counts. *Id.*

Since the decision in *Graham*, this court has taken an additional step in interpreting the language of the mail fraud statute by making explicit the distinction between mail fraud violations based on schemes "to defraud" and those based on schemes "for obtaining money or property by means of false or fraudulent pretenses, representations, or promises." In *United States v. Cronic*, 900 F.2d 1511, 1513–14 (10th Cir.1990), we clarified that schemes to defraud need not even contemplate the use of affirmative misrepresentations. However, when the government alleges mail fraud based on the statute's second type of scheme, we explained that "[f]alse or fraudulent pretenses, representations or promises" are, of course, an essential element of the scheme itself. *Id.* Thus, because Kennedy was indicted and convicted only under the statute's second prong, the government was required under *Cronic* to prove that the scheme Kennedy devised indeed involved obtaining money by means of false pretenses, representations, or promises. *See Cronic*, 900 F.2d at 1515–17 (explaining that because an unembellished check kiting scheme does not involve any affirmative misrepresentations, it may not be brought under the statute's second prong). Kennedy urges us, however, to read *Cronic* as also requiring additional, specific proof that misrepresentations were made directly to each individual investor named as an addressee in the distinct mail fraud counts—an issue that *Cronic* did not explicitly address.[12] This we decline to do.

Kennedy's suggested interpretation would be directly at odds with the plain language of the mail fraud statute, which requires only the devising of a *scheme* for obtaining money or property by means of false or fraudulent pretenses, representations, or promises—not the making of misrepresentations to any particular individuals. 18 U.S.C. § 1341. The statute clearly contemplates a separate mail fraud count each time the mail is used to help execute the fraudulent scheme—not each time a misrepresentation is made. *See Palmer v. United States*, 229 F.2d 861, 867 (10th Cir.1955), *cert. denied*, 350 U.S. 996, 76 S.Ct. 546, 100 L.Ed. 861 (1956). Although *Cronic* clarified the different types of schemes that are contemplated by the mail fraud statute, it did not undermine *Graham*'s appropriate focus on the devising of a scheme. *See also United States v. Massey*, 48 F.3d 1560, 1566 (10th Cir.) (explaining generally that a "scheme" is not limited to each individual defrauded client or each individual act of fraud, but "refers to the overall design to defraud one or many by means of a common plan or technique"), *cert. denied*, —— U.S. ——, 115 S.Ct. 2628, 132 L.Ed.2d 868 (1995). Thus, even though the government might frequently proffer evidence of actual misrepresentations to individual victims in order to help establish the existence of the alleged fraudulent scheme, *see Graham*, 120 F.2d at 544, such evidence is not required to prove the mail fraud crimes for which Kennedy was convicted.[13] *See United States v. Pepper*, 51 F.3d 469, 472–73 (5th Cir.1995) (explaining that although the government must prove the existence of the scheme to obtain money or

---

**12.** Although there is some language in *Cronic* that may arguably be read to support Kennedy's interpretation, that language was based not on the court's attempt to interpret the requirements of the mail fraud statute, but on the specific indictment and jury instructions that made up the law of that case. *See Cronic*, 900 F.2d at 1514–15.

**13.** We note that the defendant in *United States v. Stewart* challenged the sufficiency of the evidence for his mail fraud convictions on the same grounds as Kennedy, and this court did not explicitly reject the defendant's view of the government's burden of proof. 872 F.2d 957, 961 (10th Cir.1989). However, in affirming the mail fraud

convictions in *Stewart*, this court implicitly endorsed the interpretation that we now make explicit: that the government must prove that the defendant devised a *scheme* for obtaining money or property by means of actual false or fraudulent pretenses, representations, or promises, but need not prove that any of the misrepresentations were made directly to any specific individuals. The *Stewart* court did this by relying on numerous misrepresentations that the defendant made to execute the scheme generally, rather than made directly to the specific entities in the indictment, to conclude that the record "amply supports the verdicts of guilty." *Id.*

property by misrepresentations, "[t]here is no statutory requirement that direct misrepresentations must be made to the victims of the scheme"); *Kreuter v. United States,* 218 F.2d 532, 535 (5th Cir.) ("[I]t is not necessary to prove communication of the alleged false representations to the victims."), *cert. denied,* 349 U.S. 932, 75 S.Ct. 777, 99 L.Ed. 1262 (1955); *Hyney v. United States,* 44 F.2d 134, 136 (6th Cir.1930) ("Nor is it necessary that the indictment aver that false pretenses, representations, or promises were actually made or intended to be made directly to any person or class of persons."), *cert. denied,* 283 U.S. 824, 51 S.Ct. 347, 75 L.Ed. 1438 (1931).

■ Viewing the government's burden of proof under this standard, we find sufficient evidence in the record to support all of Kennedy's mail fraud convictions. Evidence existed from which a jury reasonably could find that Kennedy devised a scheme to obtain money by means of actual false pretenses, representations, or promises—specifically, by misrepresenting that metal prices would be locked-in upon ordering and that investors' money would be used to purchase metal immediately and not diverted for other uses. This evidence included testimony and documentation about the sales pitches presented to investors at WMC's "war colleges." And it included testimony from individual investors concerning their dealings with WMC. Therefore, based on this evidence, Kennedy's challenge to his mail fraud convictions must fail, whether or not sufficient evidence also existed to prove that the misrepresentations were made directly to the individuals named in each mail fraud count.

## IV. Money Laundering Convictions

Kennedy next challenges his seven money laundering convictions on three different grounds.

### A. Legal adequacy of alleged "proceeds"

■ Kennedy's first argument is that the indictment included legally inadequate allegations of the "proceeds" element of all seven money laundering convictions. We review the sufficiency of the indictment de novo, construing it liberally in favor of validity,

*United States v. Levine,* 970 F.2d 681, 685 (10th Cir.), *cert. denied,* —— U.S. ——, 113 S.Ct. 289, 121 L.Ed.2d 214 (1992), and we find no error.

The government indicted Kennedy for the specific money laundering violations set forth in 18 U.S.C. § 1956, which provides in relevant part:

(a)(1) Whoever, knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity, conducts or attempts to conduct such a financial transaction which in fact *involves the proceeds of specified unlawful activity*—

(A)(i) with the intent to promote the carrying on of specified unlawful activity

. . .

shall be sentenced to a fine . . . or imprisonment . . .

18 U.S.C. § 1956(a)(1)(A)(i) (emphasis added). The government alleged that Kennedy violated this statute by depositing checks or foreign currency from various investors into a WMC account. Each separate count represented a particular deposit involving a different named investor's funds. The government claimed that each of these deposits constituted financial transactions "involving the proceeds of specified unlawful activity"— namely, the proceeds of the mail fraud scheme described above.

■ Kennedy argues that these deposits cannot violate § 1956 because § 1956 only covers transactions that occur *after* a defendant has taken complete control of the funds from the predicate crime. Relying on *United States v. Johnson,* 971 F.2d 562 (10th Cir.1992), Kennedy suggests that to state a § 1956 money laundering violation, the indictment would have had to allege *another* transaction, subsequent to his taking possession of the funds by depositing them into a WMC account. We disagree. All that is required to violate § 1956 is a transaction meeting the statutory criteria that takes place after the underlying crime has been completed. Thus, the central inquiry in a money laundering charge is determining when the predicate crime became a "complet-

ed" offense—and it is that inquiry that distinguishes this case from *Johnson.*

In *Johnson,* the defendant was charged with money laundering under a companion statute, 18 U.S.C. § 1957. Section 1957 prohibits "knowingly engag[ing] or attempt[ing] to engage in a monetary transaction in criminally derived property," which is defined as "any property constituting, or derived from, proceeds obtained from a criminal offense." 18 U.S.C. § 1957(a), (f)(2). Each count against the defendant in *Johnson* was based on a wire transfer of funds from an investor's account directly into the defendant's account. *Johnson,* 971 F.2d at 567. Thus, the predicate crimes were the use of the wires in violation of 18 U.S.C. § 1343. Significantly, however, the only wirings that were alleged to support the predicate wire fraud crimes in *Johnson* were the very transfers of funds identified in the money laundering transactions. 971 F.2d at 569. Based on that fact, we held that the wirings could not also be used to support convictions for § 1957 money laundering crimes.

Kennedy's case is thus distinguishable in one important and dispositive respect.[14] As noted, the only use of the wires alleged in *Johnson* to prove the predicate wire fraud crimes were the very wire transfers that allegedly involved "criminally derived property" under the money laundering statute. In Kennedy's case, in contrast, the government alleged many *prior* mailings to prove the predicate mail fraud crimes, which occurred before the monetary transactions that formed the basis of his money laundering counts. Thus, unlike in *Johnson,* the illegal mailings in this case involved discrete, earlier mailings by Kennedy, rather than the receipt of funds by Kennedy from his victims. It was the subsequent and distinct transfers of funds that were alleged as the separate transactions involving "proceeds of specified unlawful activity" which constituted the alleged money laundering under § 1956.[15]

 This factual difference is important because Congress clearly intended the money laundering statutes to punish new conduct that occurs after the completion of certain criminal activity, rather than simply to create an additional punishment for that criminal activity. *United States v. Edgmon,* 952 F.2d 1206, 1213–14 (10th Cir.1991), *cert. denied,* — U.S. ——, 112 S.Ct. 3037, 120 L.Ed.2d 906 (1992); *see Johnson,* 971 F.2d at 568–69. The "completion" of both wire and mail fraud occurs when any wiring or mailing is used in execution of a scheme; there is no requirement that the scheme actually defraud a victim into investing money for the crime to be complete. *See United States v. Hollis,* 971 F.2d 1441, 1451 n. 4 (10th Cir. 1992), *cert. denied,* — U.S. ——, 113 S.Ct. 1580, 123 L.Ed.2d 148 (1993); *United States v. Kelley,* 929 F.2d 582, 585 (10th Cir.), *cert. denied,* 502 U.S. 926, 112 S.Ct. 341, 116 L.Ed.2d 280 (1991); *United States v. Stewart,* 872 F.2d 957, 960 (10th Cir.1989). Thus, because the money deposits in Kennedy's case occurred after other mailings had already completed the predicate mail fraud crime, those transfers properly could be construed as new transactions involving the proceeds of mail fraud. *See Hollis,* 971 F.2d at 1451 n. 4. In contrast, because the specific wire fraud violations alleged in *Johnson* were not complete until the wires were used to transfer the funds, those transfers could not be construed as new transactions to support a money laundering offense. Accordingly, we reject Kennedy's contention that his money laundering convictions must be set aside for failure to allege the "proceeds" element of those crimes.

**B. Jury instructions**

 Kennedy's second argument is that the seven money laundering convictions must be set aside due to improper jury instructions. Because Kennedy did not preserve this objection below, we review only for plain error. *United States v. Henning,* 906 F.2d

---

14. There are also some differences in the language of § 1956 and § 1957, but we need not address those differences here, as we distinguish *Johnson* on other grounds.

15. In fact, the parties stipulated to the fact that "the financial transactions alleged in the indictment occurred following mailings from Western Monetary Consultants, Inc. to persons who did not receive their precious metals orders." R.O.A. Vol. 38 at 2951; Vol. 39 at 3112–13.

1392, 1397 (10th Cir.1990), *cert. denied,* 498 U.S. 1069, 111 S.Ct. 789, 112 L.Ed.2d 852 (1991). Plain error exists if the contested instruction was so prejudicial or lacking in its elements that justice cannot have been served. *Id.*

■ Kennedy claims that the instructions were defective because they failed to explain that the money laundering charges required (1) that the funds involved were related to a specified unlawful activity, and (2) that Kennedy actually possessed the funds before execution of the alleged financial transactions. Because the jury instructions clearly conveyed the former requirement, *see* R.O.A. Vol. 5, doc. 170 at 50–51 (instrs. 41, 42), and the latter requirement misstates the elements of a § 1956 offense, no plain error exists. The jury instructions clearly tracked the governing statutory language, including its definitions of key terms, and correctly stated the elements of a money laundering offense.

**C. Insufficiency of the evidence**

■ Kennedy also challenges many of his specific money laundering convictions on grounds of insufficient evidence.[16] We review the record in the light most favorable to the government to decide whether, based on the direct and circumstantial evidence and all reasonable inferences therefrom, a reasonable jury could find guilt beyond a reasonable doubt. *Davis,* 1 F.3d at 1017.

Kennedy first argues that there was insufficient evidence to convict on count 101, which was based on a deposit of funds from John Whitaker on December 10, 1987, because the indictment alleged a mail fraud count based on a mailing to Whitaker on a *later date,* December 11, 1987. Similarly, he claims that he could not be convicted on count 106, which was based on a deposit of

funds from Douglas Irwin on February 19, 1988, because the indictment alleged a mail fraud count based on a mailing to Irwin on a *later date,* February 22, 1988. Kennedy argues that because the mail fraud crimes were not complete until after the mail was sent, the transfers in counts 101 and 106 cannot violate § 1956, which clearly requires a transaction *after* a predicate crime.

This argument relies on the assumption that a money laundering conviction for a transaction involving the proceeds of a mail fraud may be predicated *only* on a mail fraud count alleging a mailing to the very individual whose proceeds were involved. Because we expressly rejected this assumption in *Massey,* 48 F.3d at 1566, Kennedy's argument fails.[17] In *Massey,* the defendant similarly challenged a money laundering conviction for receiving wired funds from five clients because there was no allegation or proof that any mail was sent to those clients prior to the transfer. *Id.* However, prior to the transfer, letters had been sent to clients "other than those whose money was wired" in order to further the overall scheme, thereby completing the predicate mail fraud crime. *Id.* at 1566–67. Because a jury reasonably could conclude that the five clients who subsequently wired funds did so as a result of the overall fraudulent scheme, which had been executed through use of the mails, we held that the transfer satisfied all the elements of money laundering. *Id.* at 1657. Because similar evidence exists in this case,[18] Kennedy cannot challenge his convictions on counts 101 and 106 on these grounds.

Because Kennedy's challenges to four of his other money laundering convictions also depend on the erroneous assumption rejected in *Massey,* we reject those challenges as well. Specifically, Kennedy argues that he should not have been convicted on count 104,

---

**16.** It is unclear from Kennedy's brief whether he is raising many of these specific challenges in an attempt to set aside individual convictions, or simply as evidence to support his claim that the jury instructions were misleading. Giving Kennedy the benefit of the doubt, we will also construe them as direct challenges based on insufficiency of the evidence.

**17.** Although *Massey* dealt with money laundering under § 1957, its discussion on this particular point applies equally to § 1956.

**18.** Again, we note that the parties stipulated that "the financial transactions alleged in the indictment occurred following mailings from Western Monetary Consultants, Inc. to persons who did not receive their precious metals orders." R.O.A. Vol. 38 at 2951; Vol. 39 at 3112–13.

which is based on a deposit of funds from Fred Wacker, because the jury acquitted Kennedy of a mail fraud count that named Wacker as the mailing addressee. Because a jury nevertheless could have concluded that Wacker's transfer of funds resulted from the overall fraudulent scheme, which had been furthered by a *different* mailing, the jury properly could have concluded that the deposit involved proceeds from a predicate mail fraud crime. *See id.*, 48 F.3d at 1566–57. Kennedy also challenges his convictions on counts 99, 100, and 105, because the clients named in those counts were not named as addressees in any of the mail fraud counts in the indictment. Again, *Massey* disposes of this claim. *Id.;* 18 U.S.C. § 1956(c)(7)(A) (requiring only that the predicate unlawful activity be "indictable").

■ Kennedy's final argument directly challenges whether sufficient evidence existed to prove that the transaction alleged in count 101 actually took place. Count 101 is based on the "transfer, delivery, exchange and other deposition of approximately $225,975.73 in foreign currency" from John Whitaker. R.O.A. Vol. 1, doc. 1 at 46. Although Whitaker did not testify at trial, documents were submitted from which a jury reasonably could find that this transaction did take place. These documents indicated that after Whitaker attended a war college, he sold foreign coins to WMC in exchange for a $225,975.75 credit towards an investment in silver. Accordingly, the jury's conviction on count 101 must stand.[19]

Thus, for the reasons stated, we affirm all of Kennedy's convictions for money laundering under 18 U.S.C. § 1956.

## V. Admissibility of Evidence

Kennedy's final contention is that the district court committed reversible error by excluding evidence of completed transactions to individual investors who did not suffer losses at the hands of WMC. Kennedy argues that this evidence was needed to present his defense that WMC was operating a legitimate business and that other investors' losses were caused by mismanagement, rather than an intentionally fraudulent Ponzi scheme. Because Kennedy has not preserved this issue for appellate review,[20] we will reverse only if the court's ruling constitutes plain error. *See United States v. Oles,* 994 F.2d 1519, 1523 (10th Cir.1993).

■ We find no plain error in the court's conclusion that evidence of satisfied customers was not relevant to the defendant's case. The district court explained that the evidence did not advance the defense's position because the very nature of a Ponzi scheme "contemplates that by definition there would have to be some satisfied customers." R.O.A. Vol. 26 at 118. We agree. In a Ponzi scheme,

> returns to investors are not financed through the success of the underlying business venture, but are taken from principal sums of newly attracted investments. Typically, investors are promised large returns for their investments. Initial investors are actually paid the promised returns, which attract additional investors.

*In re Hedged–Investments Assocs., Inc.,* 48 F.3d 470, 471 n. 2 (10th Cir.1995); *Commodity Futures Trading Comm'n v. Chilcott Portfolio Management, Inc.,* 713 F.2d 1477, 1480 (10th Cir.1983) ("The scheme includes paying attractive 'profits' to some investors in order to sustain the appearance of success and increase the attractiveness of the plan to unwary investors."). Thus, the payment of profits to early investors has been referred to as the "sine qua non" of a Ponzi scheme. *In re Hedged–Investments,* 48 F.3d at 476. Because the existence of some satisfied WMC investors is consistent with the existence of the intentionally fraudulent Ponzi scheme for which Kennedy was being prosecuted, the district court did not commit plain

---

19. We note that Kennedy's argument on this count may be precluded in any event because the parties stipulated to the fact that "[e]ach financial transaction alleged in the indictment involved the funds or other proceeds which are identified in the indictment." R.O.A. Vol. 38 at 2951; Vol. 39 at 3112–13.

20. Kennedy's counsel declined to join the pretrial motion filed by a co-defendant that raised this issue below. The district court denied that motion without prejudice, subject to reassertion during trial. The issue was not raised again.

error by excluding that evidence from the defense's case.

We also note that even though the jury did not hear testimony of many individual satisfied investors, the jury was informed that WMC completed many transactions with investors who received the metal they were due, rendering any potential error harmless in any event. Thus, we reject Kennedy's contention that the court committed reversible error by excluding evidence about satisfied WMC investors at trial.

## CONCLUSION

For the reasons stated above, we AFFIRM.