FILED
United States Court of Appeals
Tenth Circuit

**April 19, 2011**

Elisabeth A. Shumaker
Clerk of Court

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

v.

JERRY C. HUFF,

Defendant-Appellant.

No. 10-4079

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH
(D.C. NO. 2:08-CR-00371-CW-1)**

---

*Submitted on the briefs*:[*]

Steven B. Killpack, Utah Federal Defender, Scott Keith Wilson, Assistant Federal Defender, and Daphne Oberg, Assistant Federal Defender, Utah Federal Defender's Office, Salt Lake City, Utah, on briefs for Appellant.

Carlie Christensen, United States Attorney, District of Utah, Elizabethanne C. Stevens, Assistant United States Attorney, United States Attorney's Office, Salt Lake City, Utah, on brief for Appellee.

---

Before **LUCERO**, **BALDOCK**, and **TYMKOVICH**, Circuit Judges.

---

[*] After examining the briefs and the appellate record, this three-judge panel has determined unanimously that oral argument would not be of material assistance in the determination of this appeal. *See* Fed. R. App. P. 34(a); 10th Cir. R. 34.1(G). The cause is therefore ordered submitted without oral argument.

**TYMKOVICH**, Circuit Judge.

The question presented in this case is whether the deposit of checks obtained through wire fraud constitutes money laundering. As part of a mortgage fraud scheme, Jerry Huff received from a title company two checks for a total of $87,570. He concedes he received the checks and went so far as to deposit them in his business's bank account. But Huff argues he never *obtained* the proceeds of the wire fraud until after he deposited the checks and therefore cannot stand convicted for money laundering—which requires a person to obtain the proceeds of unlawful activity before laundering them.

We conclude the elements of a money laundering charge are met when the defendant obtains proceeds in the form of a check as a result of wire fraud and then deposits the check into a bank account. Here, Huff received two checks representing proceeds of wire fraud and deposited those checks into his bank account. Thus, the district court did not err, much less plainly err, when it determined the government presented sufficient evidence to establish Huff engaged in money laundering of proceeds from wire fraud.

Exercising jurisdiction under 28 U.S.C. § 1291, we AFFIRM Huff's conviction.

## I. Background

Huff owned property in Moab, Utah. In October 2003, after he began construction on a new home, he submitted a loan application to First Greensboro Home Equity (FGHE), in Greensboro, North Carolina, for a $250,000 second-mortgage on the Moab property. In the loan application, Huff made false statements regarding his personal income and ability to repay the loan. Huff also submitted with the application false and fraudulent documents, including (1) a fictitious appraisal of the house, (2) photographs of the house altered to represent construction was complete, and (3) copies of his 2001 and 2002 tax returns, which created the impression Huff had filed the returns for those years, even though he had not.

In December 2003, the loan application and supporting documents were faxed from the First Greensboro New World office in Ogden, Utah to the FGHE office in Greensboro, North Carolina. Huff's loan application was approved. FGHE wire transferred $254,100.25 to Precision Title Company, which issued to Huff two checks for partial loan amounts of $66,709.07 and $20,861.00. Huff deposited both checks into his business's account at Zions National Bank.

In June 2008, Huff was indicted on one count of wire fraud (18 U.S.C. § 1343), two counts of money laundering (18 U.S.C. § 1957(a)), and two counts of failure to file tax returns (26 U.S.C. § 7203). The government alleged the fax of the fraudulent mortgage application as the basis for the wire-fraud charge and

the specified unlawful activity underlying the two money-laundering charges.

The two check deposits were the alleged monetary transactions underlying the

money-laundering charges. A jury found Huff guilty on all counts. Huff did not

move for a judgment of acquittal on the money-laundering charges either during

or after trial. The court sentenced him to one year and one day in prison, sixty

months' supervised release, and $264,050.34 in restitution.

## II. Discussion

Huff challenges only the money-laundering convictions, arguing the

government did not prove he possessed the proceeds of wire fraud before he

allegedly engaged in money laundering. He concedes our review is for plain error

because he did not move for a judgment of acquittal on the money-laundering

charges.

To obtain relief, Huff must demonstrate:

(1) an error, (2) that is plain, which means clear or obvious under
current law, and (3) that affects substantial rights. If he satisfies
these criteria, this Court may exercise discretion to correct the error
if it seriously affects the fairness, integrity, or public reputation of
judicial proceedings.

*United States v. Goode*, 483 F.3d 676, 681 (10th Cir. 2007). Plain error review

on a claim of insufficient evidence raises "the noncontroversial proposition that a

conviction in the absence of sufficient evidence of guilt is plainly an error, clearly

prejudiced the defendant, and almost always creates manifest injustice." *Id.* at

681 n.1.

A person violates § 1957(a) when he "knowingly engages or attempts to engage in a monetary transaction in criminally derived property of a value greater than $10,000 and is derived from specified unlawful activity." 18 U.S.C. § 1957(a). To prove money laundering, the government must prove five elements:

> [T]hat the defendant (1) engaged or attempted to engage, (2) in a monetary transaction, (3) in criminally derived property, (4) knowing that the property is derived from unlawful activity, and (5) that the property is, in fact, derived from specified unlawful activity.

*United States v. Baum*, 555 F.3d 1129, 1131 (10th Cir. 2009). A "monetary transaction" includes deposits to financial institutions. *See* § 1957(f)(1). "[T]he term 'criminally derived property' means any property constituting, or derived from, proceeds obtained from a criminal offense." § 1957(f)(2). Wire fraud is a type of "[s]pecified unlawful activity." *Baum*, 555 F.3d at 1131.

The sole issue Huff raises on appeal focuses on the second and third elements—whether he engaged in monetary transactions in criminally derived property when he deposited the two checks into his bank account. Huff argues the government failed to prove he obtained the proceeds of the wire fraud—the criminally derived property—before he deposited the checks—the monetary transactions. He contends the deposits themselves were not money laundering but simply the means to obtain the proceeds of the wire fraud. In his view, he obtained the proceeds of the wire fraud not when he *received* the two checks from Precision Title, but only *after* the checks were deposited into his bank account.

-5-

Huff alleges the deposits alone cannot be money laundering because he could not launder proceeds he did not yet possess. Since the check deposits were simply the means to obtain the proceeds (when the checks cleared), he argues those same deposits cannot be money laundering in those proceeds and thus his convictions on these counts cannot be sustained.

We disagree. When a person receives illicit proceeds in the form of a check, he obtains criminally derived property. When he deposits the criminally derived property—the check—in a bank, he commits money laundering. It does not matter whether the check clears or he accesses the money in his account. When he possesses the check, he possesses "any property" arising from the proceeds of a criminal offense—whether that property is in the form of cash or checks is of no moment. *See* 18 U.S.C. § 1957(f)(2); *see also* § 1956(c)(5) (defining "monetary instruments" used in money laundering transactions to include U.S. and foreign currency as well as "travelers' checks, personal checks, bank checks, and money orders"); *United States v. Silvestri*, 409 F.3d 1311, 1333 (11th Cir. 2005) ("Proceeds does not mean only cash or money. . . . There is nothing in § 1957 that requires that the proceeds be in the form of cash or that the checks must be contained in a bank account before being considered 'proceeds.'").

To be sure, Huff finds some support from a case where we considered when funds derived from wire transfers could constitute proceeds for purposes of the

-6-

money-laundering statute. In *United States v. Johnson*, we reviewed a money-laundering scheme involving the exchange of Mexican currency. 971 F.2d 562, 564 (10th Cir. 1992). The charges involved three types of wire transfers: (1) investors transferring funds to the defendant's account, (2) the defendant transferring funds to investors, and (3) the defendant's withdrawals from his account. *Id.* at 567. The government alleged all the funds involved in these transactions were proceeds of wire fraud.

The defendant argued the first set of wire transfers—the investors' transfers to his account—was not money laundering because he had not yet obtained the proceeds of the wire fraud until the funds were credited to his account. We agreed, finding:

> Whether or not the funds that were wired to the defendant were "criminally derived property" depends upon whether they were proceeds obtained from a criminal offense at the time the defendant engaged in the monetary transaction. We find they were not. *Section 1957 appears to be drafted to proscribe certain transactions in proceeds that have already been obtained by an individual from an underlying criminal offense.* The defendant did not have possession of the funds nor were they at his disposal until the investors transferred them to him. The defendant therefore cannot be said to have obtained the proceeds of the wire fraud until the funds were credited to his account.

*Id.* at 569–70 (emphasis added). The government could not allege the same wire transfers supported both wire-fraud and money-laundering charges. We reversed the money-laundering convictions that were based on the investors' wiring of funds to the defendant because these were not transactions in proceeds of the wire

fraud—they were transactions to obtain those proceeds. *Johnson* thus requires conduct distinct from wire fraud to support the monetary-transaction element of money laundering.

*Johnson* creates one difficulty for Huff. In *dicta*, we distinguished the investors' wire transfers from money-laundering transactions and addressed a factually similar situation to that presented in this appeal:

> In this case, the result achieved by causing the investors to wire the funds directly into the defendant's account was *no different than if the defendant had first obtained the funds and then deposited them himself. This latter transaction would clearly have violated § 1957.* It would be logical, then, to assume that the former transaction would also be proscribed by the statute. Yet, both the plain language of § 1957 and the legislative history behind it suggest that Congress targeted only those transactions occurring after proceeds have been obtained from the underlying unlawful activity.

*Id.* at 569 (emphasis added).

The government argues this *dicta* settles the issue in this case because Huff first obtained the funds from Precision Title and then deposited them into his bank account. In contrast, Huff contends it settles nothing because, unlike cash, he did not obtain the funds until after the checks were deposited. The *dicta* reinforces the general notion that a person must obtain the proceeds of a predicate crime before he can launder them. But it does not address whether a person, like Huff here, has obtained the proceeds of wire fraud when he possesses, but has not yet deposited, checks representing the proceeds.

Huff argues a subsequent case conflicts with our holding in *Johnson*, and should be disregarded. In *United States v. Kennedy*, 64 F.3d 1465 (10th Cir. 1995),[1] we reviewed when the deposit of checks and foreign currency into an account constituted money laundering. In that case, the government alleged the defendant violated § 1956—a companion statute to § 1957—by depositing proceeds in the form of checks and foreign currency obtained from investors through mail fraud. Each deposit was alleged to be a separate transaction in the proceeds of the mail fraud.

The defendant argued the deposits were not money laundering because he alleged § 1956 only covered transactions that occurred after he took control of the funds from the mail fraud. Relying on *Johnson*, the defendant claimed the government was required to allege another transaction—subsequent to his taking possession of the funds through their deposit—to prove a money-laundering violation. We disagreed and stated:

> All that is required to violate § 1956 is a transaction meeting the statutory criteria that takes place after the underlying crime has been completed. Thus, the central inquiry in a money laundering charge is determining when the predicate crime became a "completed" offense—and it is that inquiry that distinguishes this case from *Johnson*.

*Id.* at 1477–78.

---

[1] The government contends Huff's argument that *Johnson* and *Kennedy* conflict defeats any claim he has for plain error. *See United States v. Torres-Duenas*, 461 F.3d 1178, 1182 (10th Cir. 2006). However, we need not address this issue because we discern no conflict.

We distinguished *Johnson* on the fact that "the only wirings that were alleged to support the predicate wire fraud crimes . . . were the very transfers of funds identified in the money laundering transactions." *Id.* at 1478. By contrast, in *Kennedy*, the government alleged multiple discrete, earlier mailings by the defendant as the predicate mail-fraud offense. These mailings occurred, and the mail fraud was complete, before the alleged money-laundering transactions. Thus, unlike in *Johnson*, the government alleged "subsequent and distinct transfers of funds" by the defendant involving the proceeds of the earlier mail fraud. *Id.* We emphasized that Congress intended the money-laundering statutes "to punish new conduct that occurs after the completion of certain criminal activity, rather than simply create an additional punishment for that criminal activity." *Id.*

These cases support our conclusion that Huff's deposit of the Precision Title checks were monetary transactions in violation of § 1957. Both cases address when the underlying illegal activity was complete and whether the government had alleged separate transactions for the money-laundering offenses. In *Johnson*, the wire fraud was not complete until the investors used the wires to transfer their funds and thus those same transfers could not support separate money-laundering charges. In *Kennedy*, the mailings occurred before the deposits and therefore the mail fraud was complete at the time of the deposits which allowed the deposits to constitute monetary transactions supporting the separate money-laundering

charges. Both cases stand for the principle that a money-laundering transaction must be separate and apart from the completed predicate offense generating the proceeds used in the money-laundering transaction. *See United States v. Mankarious*, 151 F.3d 694, 706 (7th Cir. 1998) ("As we read *Kennedy*, however, the Tenth Circuit was merely reaffirming the proceeds rule announced in *Johnson*—a money laundering transaction must follow and must be separate from any transaction necessary for the predicate offense to generate proceeds.").

The facts of this case fit comfortably within the principles set forth in *Johnson* and *Kennedy*. The wire transaction that served as the basis for Huff's wire-fraud charge—the fax of the fraudulent mortgage application—was separate and apart from the monetary transactions supporting the money-laundering charges—Huff's deposit of the two checks. Huff's wire fraud was complete at the time the fraudulent mortgage application was faxed. *See Kennedy*, 64 F.3d at 1478 ("The 'completion' of both wire and mail fraud occurs when any wiring or mailing is used in execution of a scheme."). Thus, Huff's money laundering charges stem from later conduct, after the wire fraud was complete, when Huff engaged in monetary transactions—the deposit of the checks—in criminally derived property—the fraudulently obtained second-mortgage.

While the government properly alleged separate conduct for the wire fraud and money laundering, Huff contends nevertheless he did not *possess* the proceeds of the wire fraud when he deposited the two checks. Huff argues he only acquired

two checks—but not the proceeds themselves—from Precision Title, which were simply an unguaranteed promise to wire funds later and did not constitute actual possession of the proceeds of the wire fraud. In his view, the checks merely gave him access to the proceeds and he only obtained the proceeds after their deposit into his bank account.

At the outset, it appears we have not addressed the specific issue of whether a check, itself, constitutes proceeds of criminal activity. But we have previously upheld money-laundering convictions based on monetary transactions involving check deposits. *See, e.g.*, *Kennedy*, 64 F.3d at 1477 (noting the government alleged Kennedy violated § 1956 "by depositing checks or foreign currency from various investors into a [bank] account"); *United States v. Lovett*, 964 F.2d 1029, 1038 (10th Cir. 1992) ("Clearly, under the language of § 1957(f)(1), a [check] deposit falls within the scope of a monetary transaction.").

Several other circuits have addressed this issue directly and have uniformly concluded a check may constitute proceeds of criminal activity. *See Silvestri*, 409 at 1333–34 ("[U]sing the ordinary meaning of the word 'proceeds,' the checks themselves constituted proceeds of this criminal activity. . . . Indeed, common usage of the term 'proceeds' suggests a broader definition of the word encompassing checks.'"); *United States v. Cefaratti*, 221 F.3d 502, 511 (3d Cir. 2000) ("We see no legal basis for [defendant's] argument that a check, as such, cannot be proceeds.") (quotations omitted); *United States v. Hemmingson*, 157

-12-

F.3d 347, 355 (5th Cir. 1998) ("[Defendant's] argument is that the *funds* from the check, not the check itself, constituted the 'proceeds' of the crime . . . we reject [defendant's] contention that no crime is committed until the funds are disgorged.") (emphasis in original); *United States v. Haun*, 90 F.3d 1096, 1100 (6th Cir. 1996) (finding checks were proceeds of fraudulent activity and cashing or depositing checks constituted a violation of § 1956); *see also United States v. Lomow*, 266 F.3d 1013, 1018 (9th Cir. 2001) ("[D]epositing the check . . . constituted a separate transaction from the fraud that generated the funds."); *United States v. Richard*, 234 F.3d 763, 768 (1st Cir. 2000) ("[G]iving criminally derived checks to a co-conspirator, who deposits them into a bank account . . . satisfies the definition of 'monetary transaction' in § 1957(f)(1)."). We agree with their reasoning. A check may constitute the proceeds of criminal activity. Thus, an individual's deposit of a check into a bank can be a monetary transaction sufficient to support this element of a money-laundering offense.

In response, Huff contends he received only uncertified checks from Precision Title. He argues equating possession of uncertified checks with possession of proceeds is inconsistent with the treatment of negotiable instruments in the Uniform Commercial Code. An uncertified check lacks a guarantee of payment and only suspends an obligation until payment or certification discharges that obligation. *See* U.C.C. § 3-310(b)(1). Huff claims he obtained the funds represented by the uncertified Precision Title checks only after they were

deposited, negotiated, and cleared in his bank account. We find this argument unpersuasive. Whether or not a check has a guarantee of payment does not change the fact it can constitute proceeds of illegal activity. *Cf.* 18 U.S.C. § 1956(c)(5)(i) (defining "monetary instruments" for money-laundering transactions to include travelers' checks, personal checks, bank checks, and money orders). An uncertified check can be negotiated to a third party in a monetary transaction even without an underlying guarantee of payment.

In sum, we reject Huff's argument that he did not obtain the proceeds of his wire fraud until after the checks were deposited in his bank account. Huff obtained the proceeds of the wire fraud when he received the two checks and before he deposited them. Therefore, he engaged in monetary transactions in criminally derived property when he deposited those checks into his bank account, in violation of § 1957.

### III. Conclusion

For the foregoing reasons we AFFIRM Huff's conviction.