**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**May 27, 2005**

**PATRICK FISHER**
**Clerk**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

UNITED STATES OF AMERICA,

        Plaintiff-Appellee,

v.

DANZENA D. DEGUZMAN,

        Defendant-Appellant.

No. 04-1433

(D. Colorado)
(03-CR-483-D)

**ORDER AND JUDGMENT**[*]

Before **EBEL, BRORBY,** and **HENRY,** Circuit Judges.

      Defendant-Appellant Danzena D. Deguzman appeals from a jury's verdict

of guilt, contesting the sufficiency of the evidence, the district court's imposition

of restitution, and the district court's loss calculation. Exercising jurisdiction

pursuant to 28 U.S.C. § 1291, we affirm.

---

      [*] This order and judgment is not binding precedent, except under the
doctrines of law of the case, res judicata, and collateral estoppel. The court
generally disfavors the citation of orders and judgments; nevertheless, an order
and judgment may be cited under the terms and conditions of Tenth Circuit Rule
36.3.

## I. BACKGROUND

Between June 2000 and May 2001, Ms. Deguzman recruited four men with training and experience as computer programmer analysts to come to the United States from the Philippines to work in the information technology (IT) field. She told them they would be employees of her firm, DCG Consulting (DCG), a company that supplies IT experts to other companies. She promised paid annual salaries of $42,000, medical and dental benefits, and jobs as programmer analysts at Qwest or some other DCG client. Ms. Deguzman also assured the men that DCG would secure H-1B visas from the United States Immigration and Naturalization Service (INS) permitting them to reside temporarily in the United States as non-immigrant professionals. Although she initially told them there was a ninety percent chance they would be assigned to work at Qwest, she later informed them that they would probably have to work for no more than three months in clerical or other non-IT jobs.

Ms. Deguzman promised to pay for the men's transportation to the United States, their additional training, some cash advances, and their housing. In exchange, the men were required to sign agreements and promissory notes promising to work exclusively for DCG, to repay DCG by payroll deductions from their salaries, and to pay DCG $20,000 if they breached their employment commitments.

Ms. Deguzman signed and filed petitions with the INS for the issuance of H-1B visas for the men. Visas of this kind may only be submitted by the employer who will employ a named alien in the specific job identified in the petition. In her petitions, Ms. Deguzman certified under oath that DCG would employ the men as programmer analysts at Qwest through a subcontract DCG had with Productive Data Systems (PDS). The INS issued the H-1B visas, expressly conditioning the men's legal presence in the United States on their employment as specified in the petitions. Because Ms. Deguzman was the petitioner, she was required by law to notify the INS if an alien admitted under an H-1B visa ceased to be employed in strict compliance with the conditions of the visa.

In fact, DCG's subcontract with PDS merely provided that DCG would supply IT specialists to PDS's clients if PDS was unable to do so itself. The subcontract did not specify any positions for which IT specialists would be sought from DCG and did not obligate PDS to obtain any IT specialists from DCG. Ultimately, PDS never obtained any IT specialists from DCG whatsoever.

On May 5, 2001, the four men entered the United States on the H-1B visas. Ms. Deguzman immediately provided shared housing accommodations for them in the basement of her house, for which she charged them between $200-$250 per month in rent after the first three months. DCG did not employ the men and they never received the promised salaries or benefits from DCG. Only one of the men

3

ever performed IT work, and that was as an hourly-wage employee of a state government agency. The other three men worked only in non-IT positions with casinos and temporary employment agencies. The variance between these jobs and the jobs indicated on their H-1B visas rendered illegal their status in the United States. Ms. Deguzman nevertheless demanded that the men pay her various amounts of money in monthly installments. In July 2002, she also instructed the men to backdate documents falsely indicating they had taken leaves of absence from DCG when they arrived in the United States in May 2001.

A jury convicted Ms. Deguzman on each count of a fourteen-count superseding indictment alleging mail fraud in violation of 18 U.S.C. § 1341, wire fraud in violation of 18 U.S.C. § 1343, harboring aliens unlawfully in the United States in violation of 8 U.S.C. § 1324(a)(1)(A)(iii), lying on visa applications in violation of 18 U.S.C. § 1546, and inducing the unlawful entry of aliens into the United States in violation of 8 U.S.C. § 1324(a)(1)(A)(iv). The district court sentenced her to fourteen months of imprisonment on each count to be served concurrently. Ms. Deguzman now appeals her conviction and order of restitution, and we affirm.

## II. DISCUSSION

In this appeal, Ms. Deguzman challenges her conviction and restitution

4

order on three grounds. First, she argues the evidence at trial was insufficient to support the jury's verdict of guilt because the government failed to prove the "specific intent" element of wire fraud and mail fraud. Second, she contends the district court erred when it included the men's rent payments in its imposition of restitution because their rent was not part of any scheme to defraud. Finally, she avers that the jury, instead of the judge, should have determined the amount of loss suffered as a result of the scheme and the amount of restitution she owed, pursuant to the Supreme Court's recent opinion in *United States v. Booker*, 125 S. Ct. 738 (2005). We will address each argument in turn.

## A.   Sufficiency of the Evidence on Mail Fraud and Wire Fraud

We review de novo claims that the evidence at trial was insufficient to sustain a conviction. *United States v. Munro*, 394 F.3d 865, 869 (10th Cir. 2005). In doing so, we view all the evidence in the light most favorable to the government because it was the prevailing party in the district court. *Id.* (citing *United States v. Hooks*, 780 F.2d 1526, 1529 (10th Cir. 1986)). Ultimately, we must determine only whether the evidence–both direct and circumstantial, together with the reasonable inferences drawn therefrom–could allow a reasonable jury to find Ms. Deguzman guilty beyond a reasonable doubt. *United States v. Magleby*, 241 F.3d 1306, 1311-12 (10th Cir. 2001).

The mail fraud statute under which Ms. Deguzman was convicted provides

5

in relevant part:

> Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, . . . for the purpose of executing such scheme or artifice or attempting so to do, places in any post office or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the Postal Service . . . or knowingly causes to be delivered by mail or such carrier according to the direction thereon . . . shall be fined under this title or imprisoned not more than 20 years, or both.

18 U.S.C. § 1341.

To establish a violation under § 1341, the government must prove beyond a reasonable doubt (1) the devising of a scheme or artifice either (a) to defraud or (b) for obtaining money by means of false or fraudulent pretenses, representations, or promises, (2) the specific intent to defraud, and (3) the use of the United States mails to execute the scheme. *United States v. Kennedy*, 64 F.3d 1465, 1475 (10th Cir. 1995).

Similarly, the wire fraud statute under which Ms. Deguzman was convicted provides in relevant part:

> Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice, shall be fined under this title or imprisoned not more than 20 years, or both.

18 U.S.C. § 1343.

6

To establish wire fraud under § 1343, the government must prove beyond a reasonable doubt (1) a scheme or artifice to defraud, (2) intent to defraud, and (3) use of interstate wire communications to facilitate the scheme. *United States v. Welch*, 327 F.3d 1081, 1104 (10th Cir. 2003).

Thus, "[t]he wire and mail fraud charges require that the jury find that [Ms. Deguzman] acted with intent to defraud or intent to deceive." *United States v. Lawrence*, 405 F.3d 888, 900 (10th Cir. 2005). Ms. Deguzman argues that the evidence the government presented at trial was insufficient, as a matter of law, to prove that she had the specific intent to devise a scheme to defraud the men: "[e]ven if the evidence tended to show that [she] did intend to deceive the government in furtherance of her scheme, it is not enough to prove specific intent for the purpose of mail fraud." Aplt's Br. at 17. Ms. Deguzman attempts to explain that because she never received any money *from the government*–the party deceived by the false visa applications–there could not have been a scheme to defraud for financial gain. In support of this proposition, she relies on *United States v. Lew*, 875 F.2d 219 (9th Cir. 1989), in which the Ninth Circuit reversed a mail fraud conviction because the intent of an alleged fraudulent scheme must be to obtain money or property from the deceived party. *Id.* at 221.

There are at least two reasons why *Lew* is inapplicable here. First, *Lew* is factually distinct from this case in a critical way. In *Lew*, the court was careful to

7

note that the false statements were made only to the government, *not to the intended individual victims of the scheme*. *See Lew*, 875 F.2d at 221-22 ("The government . . . has been unable to refer us to, and we have been unable to find, *any* evidence in the record that Lew deceived his clients." (emphasis in original)). In this case, however, the government explicitly alleged that Ms. Deguzman's scheme involved false promises she made directly to the Filipino men, *as well as* false statements she made to the government in the H-1B visa applications she submitted to the INS. When she mailed the false visa applications and sent emails including deceptive information, she violated the wire fraud and mail fraud statutes as long as the false statements in the visa applications and emails were part of her scheme to defraud the individual victims. It is quite clear that they were: Ms. Deguzman had to obtain INS permission for the men to be in the United States in order to effectuate the remainder of her scheme to receive payments from them for rent, loans, travel costs, and the like. Without the visas, Ms. Deguzman could not get the men into the country or past INS, and her scheme to profit by deceiving them would never have come to fruition. Likewise, as soon as Ms. Deguzman used emails to communicate with the men to execute her fraudulent scheme, she committed wire fraud.

*Lew* is also inapplicable to this case because we have held that evidence of false statements to individual victims is unnecessary in proving mail fraud. *See*

8

*Kennedy*, 64 F.3d at 1476 ("[E]ven though the government might frequently proffer evidence of actual misrepresentations to individual victims in order to help establish the existence of the alleged fraudulent scheme, such evidence is not required" to prove a mail fraud scheme (internal citation omitted)) (citing *United States v. Pepper*, 51 F.3d 469, 472-73 (5th Cir. 1995) (explaining that although the government must prove the existence of the scheme to obtain money by misrepresentations, "[t]here is no statutory requirement that direct misrepresentations be made to the victims of the scheme")). As we noted in *Kennedy*, the plain language of the mail fraud statute "requires only the devising of a *scheme* for obtaining money or property by means of false or fraudulent pretenses, representations, or promises – not the making of misrepresentations to any particular individuals." *Kennedy*, 64 F.3d at 1476 (emphasis in original).

We have examined the record and determined that the evidence and all reasonable inferences drawn therefrom could allow a reasonable jury to find Ms. Deguzman guilty beyond a reasonable doubt of devising such a scheme, with the intent to defraud, and using the mails to execute the scheme. The record reflects testimonial and documentary evidence from which the jury could determine that Ms. Deguzman made false statements and representations to the Filipino men about who they would work for, the likelihood of them finding work as programmer analysts at other companies, the salaries and benefits they would

9

receive, the duties they would perform, and the conditions under which they would pay Ms. Deguzman. *See* Aplt's App., vol. I at 77-141, vol. II at 201-260, vol. III at 438-467.

Moreover, there is ample evidence from which the jury could reasonably determine that Ms. Deguzman submitted visa applications to the INS under oath which contained false information about whether the jobs for which the men were being authorized entry were "actual" jobs. *See id.*, vol. III at 366-397. In addition, there was evidence that Ms. Deguzman demanded money from the men while failing to employ them as indicated in the visa petitions she mailed, and that she failed to properly inform the INS that their actual employment was not in compliance with the requirements of their H-1B visas. *See id.*, vol. I at 77-141, vol. II at 201-260, vol. III at 366-397, 438-467. Perhaps most indicative of her intent to defraud, Ms. Deguzman caused the men to sign backdated documents in July 2002 falsely indicating that they had taken leaves of absence from DCG upon their arrival in the United States in May 2001. *See id.*, vol. I at 117-22, 184, vol. II at 235-41, vol. III at 459-60. The jury also heard evidence that Ms. Deguzman threatened legal and financial consequences to the men and their families if they did not continue to pay her the money she demanded, including reporting the men's illegal status to the INS. *See id.*, vol. I at 126-132, vol. II at 249-258, vol. III at 462-63.

10

It is simply impossible for us to conclude that no reasonable jury could convict when faced with all this evidence. Because the evidence was neither inherently incredible nor resolved in an unreasonable manner by the jury, we are bound by the jury's resolution of the evidence. *Allen v. Wal-Mart Stores, Inc.*, 241 F.3d 1293, 1297 (10th Cir. 2001) ("The weighing of evidence, the reconciliation of inconsistent testimony, and the assessment of a witness' credibility is solely within the province of the jury."); *United States v. McKissick*, 204 F.3d 1282, 1289-90 (10th Cir. 2000) ("It is for the jury, as the fact finder, to resolve conflicting testimony, weigh the evidence, and draw inferences from the facts presented."); *United States v. Smith*, 131 F.3d 1392, 1399 (10th Cir. 1997) ("[U]nless the testimony is inherently incredible . . . we must resolve credibility choices in favor of the jury's verdict.") (quotation omitted); *Messer v. Roberts*, 74 F.3d 1009, 1013 (10th Cir. 1996) ("[T]he Court must accept the jury's resolution of the evidence as long as it is within the bounds of reason.") (quotation omitted).

Ms. Deguzman next attempts to bootstrap her appeal of the other counts of conviction to the mail and wire fraud counts. She argues that reversal of her conviction is required as to every count "[b]ecause each count of the Superseding Indictment relied upon the existence of the fraudulent scheme" alleged in the mail fraud and wire fraud counts. *See* Aplt's Br. at 20. According to Ms. Deguzman, her convictions for harboring illegal aliens (Counts 6-8), making material false

11

statements under oath in her applications to the INS for H-1B visas (Counts 9-11), and inducing aliens to enter the United States illegally (Counts 12-14), must be reversed because of the alleged insufficiency of evidence with regard to specific intent to defraud. This is clearly wrong. None of the other charges require proof of specific intent to defraud, and we conclude that the government met its burden on specific intent to defraud in the mail and wire fraud charges. We need not address this argument further.

## B. Inclusion of Rent in the Restitution Order

The record reflects that Ms. Deguzman initially objected to the court's inclusion of the amount of the monthly rent payments in its restitution order, but later withdrew the objection:

> I might also be able to put on the record, to make sure that this is resolved, in our objections to the presentence report, we had a list of different values that we thought were applicable. We have – we will withdraw those because we did not calculate into those numbers the values of the rents that are considered. Though we disagree with it, it's not incorrect. So those objections are now resolved and/or withdrawn, whichever the Court prefers. That may help a little bit.

Aplt's App., vol. IV at 714.

On appeal, Ms. Deguzman argues she withdrew the objection solely with regard to the determination of offense level for sentencing, but not with regard to the restitution amount. Aplt's Br. at 22. While we are inclined to believe that she actually did withdraw her objection and therefore failed to preserve the issue for

12

appellate review, the record's lack of clarity compels us to address the issue.

We review the legality of a restitution order *de novo*. *United States v. Nichols*, 169 F.3d 1255, 1278 (10th Cir. 1999). We review the factual findings underlying a restitution order for clear error and the amount of restitution for an abuse of discretion. *Id.* Under the Mandatory Victim's Restitution Act, the sentencing court must order the defendant to pay restitution to the victim in an amount equal to the actual loss suffered by the victim. 18 U.S.C. § 3663A(c)(1)(A)(ii), (a)(2), and (b)(1); *United States v. Messner*, 107 F.3d 1448, 1455 (10th Cir. 1997).

Ms. Deguzman argues the district court should not have included in its restitution order the amounts the men paid her for "renting" the basement of her house during the scheme because rent is not "a loss the men sustained as a result of the fraudulent scheme." Aplt's Br. at 24. According to Ms. Deguzman, (1) the employment agreements she induced the men to sign "put [them] on notice that the housing they were provided upon their arrival in the U.S. had a value of $250 per month per person"; (2) "the cost of living is a reasonable, foreseeable expense"; (3) the rent she received "correspond[s] to what the men would have paid as average monthly rent for a two-bedroom apartment elsewhere"; and (4) "it was the men themselves who decided not to move during the 20-month period they paid rent." Aplt's Br. at 23-24. The government contends that the rent was

13

part of the scheme and therefore should be included in the restitution amount.

We agree with the government and conclude that the rent was part of the loss the men sustained as a result of the fraudulent scheme. The housing provision in the employment agreements was an important part of the scheme because it enabled Ms. Deguzman to monitor the men's activities and incomes, in addition to producing a substantial portion of the money that was her financial focus. The agreement allowed Ms. Deguzman to keep the men in her control because of the threat that she would turn them in to the INS. This allowed her further opportunities to collect rent from them. Ms. Deguzman's fraudulent scheme created the men's very need for accommodations, and the accommodations furthered her perpetuation of the scheme. The district court correctly recognized that the wellspring of criminal behavior in this case was the fraudulent scheme: "it would seem to me that but for the defendant's scheme to lure the Filipino citizens to this country, none of the rest of this would have happened." Aplt's App. at 705.

In short, the rent she required them to pay constituted a substantial portion of the financial gain she sought from the scheme, and was conversely a substantial portion of the loss the victims incurred. We conclude that the restitution order was legal. Moreover, because there is neither a dispute about the factual findings underlying the restitution order nor any disagreement about the

14

amounts of rent paid, the district court neither erred nor abused its discretion in imposing the rent payments as part of restitution.

## C.    *Blakely/Booker* Issues

The Supreme Court announced its decision in *United States v. Booker*, 125 S. Ct. 738 (2005), one week after Ms. Deguzman filed her opening brief. However, the Court had already announced its ruling in *Blakely v. Washington*, 124 S. Ct. 2531 (2004). Ms. Deguzman objected to the Presentence Report on the ground that *Blakely* forbade the court from enhancing her base offense level by the inclusion of the rent as a loss-related specific offense characteristic. *See* Aplt's App., vol. V at 771. The district court ruled during sentencing that "the *Blakely* case by its terms doesn't apply to sentences under the federal sentencing guidelines." Aplt's App., vol. IV at 703. The court went on to give Ms. Deguzman's counsel a specific opportunity to raise a *Blakely*-type argument: "The Supreme Court presumably will clarify the ramifications of *Blakely*, and I will let you make a record, Miss Shein, if you want to on that, but I'm not going to apply *Blakely* one way or the other." *Id.*

Ms. Deguzman's counsel did not make a further record with regard to loss amount and did not make any *Blakely* argument regarding restitution. Instead, she raises for the first time in her reply brief a terse argument that reads in full:

> In light of the recent decision in *United States v. Booker*, 543 U.S. — (2005), this Honorable Court should remand for a determination not

15

only of the restitution but as to the loss value. The jury must make this determination. Appellant relies on the remainder of her initial brief in support of remand on this issue.

Aplt's Rep. Br. at 8.

Ms. Deguzman did not, however, address in her opening brief the issues of plain or harmless error, whether she preserved in the district court either the restitution or the loss-value argument under *Blakely/Booker*, or whether loss value and/or restitution are facts that must be found by a jury. Moreover, as we note above, she withdrew at the sentencing hearing her objection with regard to amount of loss. *See* Aplt's Br. at 22. In this context, we conclude she has failed to adequately raise a *Blakely/Booker* challenge on appeal with regard to either issue. Perfunctory complaints that fail to frame and develop an issue are insufficient to invoke appellate review. *Murrell v. Shalala*, 43 F.3d 1388, 1389 n.2 (10th Cir. 1994). Moreover, "[i]t is insufficient merely to state in one's brief that one is appealing an adverse ruling below without advancing reasoned argument as to the grounds for the appeal." *Am. Airlines v. Christensen*, 967 F.2d 410, 415 n.8 (10th Cir. 1992) (citing FED. R. APP. P. 28(a)(4), now FED. R. APP. P. 28(a)(9)) ("The appellant's brief must contain . . . appellant's contentions and the reasons for them, with citations to the authorities and parts of the record on which the appellant relies.").

### III. CONCLUSION

For the foregoing reasons, we **AFFIRM** Ms. Deguzman's conviction and the district court's calculation of loss and restitution.

Entered for the Court,

Robert H. Henry
Circuit Judge